# TEXAS *v.* LOUISIANA

No. 36, Orig.   Argued December 11, 1972—
Decided March 20, 1973

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined.   DOUGLAS, J., filed a dissenting opinion, *post,* p. 714.

*Samuel D. McDaniel* argued the cause for plaintiff in support of the Report of the Special Master.   On the brief were *Crawford C. Martin,* Attorney General of Texas, *Nola White,* First Assistant Attorney General, and *Houghton Brownlee, Jr., J. Arthur Sandlin,* and *James H. Quick,* Assistant Attorneys General.

*Oliver P. Stockwell,* Special Assistant Attorney General of Louisiana, argued the cause for defendant on exceptions to the Report of the Special Master.   With him on the brief were *William J. Guste, Jr.,* Attorney General, *John L. Madden,* Assistant Attorney General, and *Sam H. Jones, Jacob H. Morrison,* and *Emmett C. Sole,* Special Assistant Attorneys General.

MR. JUSTICE WHITE delivered the opinion of the Court.

Texas brought this original action against Louisiana to establish its rights to the jurisdiction and ownership of the western half of Sabine Pass, Sabine Lake, and Sabine River (collectively Sabine) from the mouth of the Sabine in the Gulf of Mexico to the thirty-second degree of north latitude, and to obtain a decree confirming the boundary of the two States as the geographic middle of the Sabine. After the motion to file was granted, 397 U. S. 931 (1970), Louisiana filed motions, answer, and counterclaim asserting that its boundary was on the west bank of the Sabine; and the case was referred to a Special Master, 398 U. S. 934 (1970).

The Report of the Special Master and the parties' exceptions are now before us. The Special Master's recommendations are that the geographic middle, not the west bank or the middle of the main channel, is the boundary between the two States; that all islands in the Sabine when Louisiana was admitted as a State in 1812 should be awarded to Louisiana subject to pre-scriptive claims, if any, by Texas to such islands; that all islands formed in the east half of the Sabine after 1812 belong to Louisiana, and those in the west half to Texas. The Special Master contemplates further proceedings to determine what islands were in the Sabine in 1812 and what prescriptive claims Texas may have to such islands. Louisiana's exceptions maintain that its boundary is not the geographic middle but the west bank of the Sabine, or alternatively, the main channel of the stream as it existed in 1812 west of the most westerly islands. Louisiana also claims all islands in the Sabine, whether existing in 1812 or thereafter formed. The exception filed by Texas asserts its right to all islands in the west half of

the river but proposes that the question of ownership be deferred pending the outcome of the proposed additional proceedings with respect to islands that may have existed as of 1812.

Oral argument was heard on the exceptions. We now approve and adopt the report of the Special Master except his conclusions with respect to ownership of islands in the western half of the Sabine.

## I

In an Enabling Act approved February 20, 1811, 2 Stat. 641, Congress authorized the inhabitants of a portion of the Louisiana Territory ceded under the Treaty between the United States and France on April 30, 1803, 8 Stat. 200, to seek statehood. The Sabine boundary for what was to become the State of Louisiana was described as "beginning at the mouth of the river Sabine, thence by a line to be drawn along the middle of the said river, including all islands to the thirty-second degree of latitude . . . ." 2 Stat. 641. The 1812 Louisiana Constitution described the State's western boundary in substantially the same manner,[1] and the Act of Admission of April 8, 1812, 2 Stat. 701, employed language identical to that of the Enabling Act.

Preceding this period, and for some time thereafter, the western boundary of the United States was in doubt. Negotiations between the United States and Spain from 1803 until 1819 culminated in the Treaty of Amity, Settlement, and Limits, 1819, 8 Stat. 252. Under this treaty, the boundary "between the two countries" was in relevant part established along the west bank of the Sabine, 8 Stat. 254; the United States relinquished all of Texas

---

[1] The preamble to the 1812 Louisiana Constitution described the boundary as along the middle of the Sabine, "including all *its* islands." (Emphasis added.)

west of that boundary in exchange for Florida and the Spanish claim to the Oregon Territory; and it was provided that all islands in the Sabine belonged to the United States.

The United States renewed its efforts to acquire Texas, and when Mexico declared its independence from Spain in 1821, the United States began negotiating anew for the purchase of Texas. In the Treaty of Limits, 1828, 8 Stat. 372, the United States and Mexico recognized the boundary "between the two countries," *id.*, at 374, on the west bank of the Sabine as established in the 1819 treaty with Spain.[2] Texas declared its independence from Mexico in 1836, 1 Laws, Republic of Texas, 3–7, in Gammel's Laws of Texas 1822–1897, was recognized as an independent nation by the United States in 1837, Cong. Globe, 24th Cong., 2d Sess., 83, 270, and in 1838 the Sabine boundary agreed upon with Spain in 1819, and with Mexico in 1828, was adopted by the United States and Texas, 8 Stat. 511.[3] The Sabine boundary remained unchanged when Texas was admitted as a State in 1845, 9 Stat. 108.

In 1848 the legislatures of Texas and Louisiana passed competing resolutions, each requesting consent of Congress to establish its jurisdiction over the Sabine between the middle and the western bank.[4] Congress passed an

---

[2] Neither the 1819 Treaty nor the 1828 Treaty mentions Louisiana or its western boundary.

[3] Texas' relevant boundary along the Sabine thus began "on the gulf of Mexico, at the mouth of the river Sabine, in the sea, continuing north along the western bank of that river, to the 32d degree of latitude . . . ." 8 Stat. 374.

[4] The Louisiana Resolution, passed on March 16, 1848, and presented to Congress, provided in pertinent part:

"Whereas the constitution and the laws of the State of Louisiana, nor those of any other State or territory, extend over the waters of the Sabine river from the middle of said stream to the western bank thereof; and that it is of importance to the citizens living contiguous

Act in 1848 giving its consent to Texas to extend its eastern boundary from the west bank of the Sabine to the middle, 9 Stat. 245, the Act stating:

"[T]his Congress consents that the legislature of

thereto, and to the people in general, that the jurisdiction of some State should be extended over said territory, in order that crimes and offences committed thereupon should be redressed in a speedy and convenient manner:

"*Therefore be it resolved by the Senate and House of Representatives of the State of Louisiana in General Assembly convened,* 1st. That the constitution and the jurisdiction of the State of Louisiana shall be extended over part of the United States, embraced in the following limits (whenever the consent of the Congress of the United States can be procured thereto,) viz:

"Between the middle of the Sabine river and the western bank thereof, to begin at the mouth of said river where it empties into the Gulf of Mexico, and thence to continue along the said western bank to the place where it intersects the thirty-second degree of north latitude, it being the boundary line between the said State of Louisiana and the States of—.

"2d. *Be it further resolved, etc.,* That our Senators be instructed, and our Representatives in Congress requested, to procure the passage of a law on the part of the United States, consenting to the extension of the constitution, and the jurisdiction of the laws of the State of Louisiana, over the territory in said river." S. Misc. Doc. No. 135, 30th Cong., 1st Sess.

The Resolution adopted by Texas on March 18, 1848, stated in relevant part:

"*Resolution of the Legislature of Texas, in favor of the passage of an act, extending the jurisdiction of that State over the Sabine pass, the Sabine lake, and the Sabine river, April 17, 1848.*

"*Joint Resolution instructing our Senators and requesting our Representatives in Congress to use their efforts to have a law passed to extend the jurisdiction of Texas over one half of Sabine pass, lake, and river.*

"*Sec. 1. Be it resolved by the Legislature of the State of Texas,* That our Senators be instructed, and our Representatives in Congress be requested, to use their efforts to have a law passed by Congress, extending the jurisdiction of Texas over one half of the waters of Sabine lake, Sabine pass, and Sabine river, up to the 32° of north latitude." S. Misc. Doc. No. 123, 30th Cong., 1st Sess.

the State of Texas may extend her eastern boundary so as to include within her limits *one half* of Sabine Pass, *one half* of Sabine Lake, also *one half* of Sabine River, from its mouth as far north as the thirty-second degree of north latitude." (Emphasis added.)

## II

We agree with the Special Master that the western boundary of Louisiana is the geographical middle of the Sabine River, not its western bank or the middle of its main channel. Congress had the authority to admit Louisiana to the Union and to establish the boundaries of that State. U. S. Const., Art. IV, § 3; *United States* v. *Louisiana,* 363 U. S. 1, 30, 60–62, 67 (1960); *Washington* v. *Oregon,* 211 U. S. 127, 134–135 (1908). Hence, our task is to ascertain congressional will when it admitted Louisiana into the Union on April 8, 1812, and established her relevant western boundary as "beginning at the mouth of the river Sabine; thence, by a line to be drawn along the middle of said river, including all islands to the thirty-second degree of latitude . . . ." 2 Stat. 702. The statute in this respect was identical with the Enabling Act of the prior year and differed hardly at all from the Preamble to the Louisiana Constitution of January 22, 1812. The Louisiana Legislature resolved in 1848 that the State's jurisdiction should be "extended" to the western half of the river, reciting that neither it nor any other State had authority over that portion of the Sabine. See n. 4, *supra.* Texas made a similar request, see n. 4, *supra,* Congress acceding to the latter and consenting that Texas could "extend her eastern boundary so as to include within her limits one half of Sabine Pass, one half of the Sabine Lake, also one half of Sabine River, from its mouth . . . [to] the thirty-second degree of north latitude." 9 Stat. 245. On the floor of the Senate, Mr. Butler, speaking for the Judiciary

Committee, stated that the boundaries of the United States extended to the western shore of the Sabine, but that the boundary of the State of Louisiana extended only to the middle, the result being that "the half of the river and lake, to the western shore, belonged to the United States, and was not included in the State of Louisiana . . . ." Cong. Globe, 30th Cong., 1st Sess., 882. Hence the bill, which gave "the half of the river beyond the boundary of the State of Louisiana to the State of Texas . . . ." *Ibid.* The bill passed, both Senators from Louisiana expressing "their acquiescence in the arrangement." *Ibid.*[5]

There is not a whisper in these statutes and instruments that the western boundary of Louisiana was on the west bank of the Sabine. Clearly, the boundary was

---

[5] The full report of the action by the Senate, Cong. Globe, 30th Cong., 1st Sess., 882, is as follows:

"Mr. Butler, from the Committee on the Judiciary, reported an act giving the consent of the Government of the United States to the State of Texas to extend the eastern boundary *so as to include within her limits one-half of the Sabine Pass, Sabine Lake, and Sabine River* as far north as the 32° of north latitude.

"Mr. B. asked for the immediate consideration of the bill, and briefly explained its character. The boundary of the United States, it was known, embraced the Sabine River and lake to its western shore. The boundary of the State of Louisiana extended to the middle of the Sabine; *so that the half of the river and lake, to the western shore, belonged to the United States, and was not included in the State of Louisiana;* therefore, the boundary of the State and that of the United States, was not identical. The bill before the Senate gives the half of the river beyond the boundary of the State of Louisiana to the State of Texas, for the purpose of enabling the latter to extend her criminal jurisdiction to the Louisiana boundary. There could be no objection to the bill, and he hoped it would now be passed.

"Mr. Johnson, of La., and Mr. Downs in behalf of the State of Louisiana, expressed their acquiescence in the arrangement.

"The bill was then read a third time and passed." (Emphasis added.)

along the "middle" of the Sabine, not on the west bank. Louisiana argues, without substance we think, that the boundary was extended to the west bank by the Treaties of 1819 and 1828 with Spain and Mexico respectively, when the United States established and confirmed its own western boundary on the west bank of the Sabine. As the Special Master correctly noted, however, the United States was acting in its sovereign capacity throughout these events, and there is no indication that the United States was in any way representing Louisiana or intending to relocate the State's western border. Nor was there reason to do so. On the contrary, admission of States beyond the Sabine was some day contemplated, and it was more consistent with the policy of the United States to grant only the east half of the river to Louisiana and reserve the west half for a future State or States. See *United States* v. *Holt State Bank,* 270 U. S. 49, 55 (1926); *Shively* v. *Bowlby,* 152 U. S. 1, 26–28, 57–58 (1894).

The Special Master was also correct in ruling that the United States intended the geographic middle of the river, not of the main channel, or thalweg, to be the western boundary of the State. The argument that the middle of the main channel was intended rests on the line of cases in this Court beginning with *Iowa* v. *Illinois,* 147 U. S. 1 (1893), which hold that in normal circumstances it should be assumed Congress intends the word "middle" to mean "middle of the main channel" in order that each State would have equal access to the main navigable channel.[6] The doctrine was borrowed from international

---

[6] That the "middle" of a river was to be construed as the thalweg in establishing the boundary between the States newly admitted to the Union was not authoritative doctrine prior to 1892 when *Iowa* v. *Illinois,* 147 U. S. 1, was decided and certainly not when Louisiana was admitted to the Union in 1812. The opinion in *Iowa* v. *Illinois, supra,* referred to five treatises on international law in support of its holding but noted the sharp conflict on the thalweg

law and has often been adhered to in this Court, although it is plain that within the United States two States bordering on a navigable river would have equal access to it for the purposes of navigation whether the common state boundary was in the geographic middle or along the thalweg. *Id.,* at 7–8, 10; *New Jersey* v. *Delaware,* 291 U. S. 361, 380–385 (1934).

In *Iowa* v. *Illinois,* however, the Court recognized that the issue was the intent of Congress, 147 U. S., at 11, and that it was merely announcing a rule of construc-' tion with respect to statutes and other boundary instruments. Thus, it was acknowledged that the rule might be "changed by statute or usage of so great a length of time as to have acquired the force of law." *Id.,* at 10.

When Congress sufficiently indicates that it intends a different boundary in a navigable river, the thalweg rule will not apply.[7] In *Washington* v. *Oregon,* 211 U. S. 127 (1908), the usual rule of the thalweg was recognized, but the Court said that "there is no fixed rule making that the boundary between States bordering on a river." *Id.,* at 134. The Act admitting Oregon was construed by the Court as placing the northern boundary of the State in the northern channel of the Columbia River and as intending it to remain there even

rule between the Illinois and Iowa courts. In *Dunlieth & Dubuque Bridge Co.* v. *County of Dubuque,* 55 Iowa 558, 8 N. W. 443 (1881), though the phrase in question was "middle of the main channel," certainly a phrase that would lend itself to a thalweg construction, the court instead ruled that the phrase meant the middle of the river bed, while in *Buttenuth* v. *St. Louis Bridge Co.,* 123 Ill. 535, 17 N. E. 439 (1888), the court construed the phrase "middle of the Mississippi River" as being under the thalweg doctrine. After reviewing both cases, this Court chose the latter rule of construction.

[7] A sufficiently expressed intent of Congress also overrides the usually applicable "equal-footing" rule, *United States* v. *Louisiana,* 363 U. S. 1, 76–77 (1960).

though that channel ceased to be the main navigable channel in the Columbia.

It was therefore imperative for the Special Master to look to congressional intent; and if it was sufficiently clear that Congress intended the Louisiana boundary to be the geographic middle of the Sabine rather than the thalweg, it was his duty to establish the border along the former line. His conclusion was surely consistent with the controlling instruments—"along the middle of the . . . river." It is also apparent that the parties to the Act of Admission, the United States and Louisiana, both evidenced their understanding of the 1811 Enabling Act, the 1812 Constitution of Louisiana, and the 1812 Act of Admission, when the Legislature of Louisiana and the Congress of the United States expressly recited in 1848 that the western boundary of Louisiana included only the east half of the Sabine, not the west half. Whatever may be the normal significance of a later congressional indication of the meaning of an earlier statute, see, *e. g.*, *Glidden Co.* v. *Zdanok,* 370 U. S. 530, 541 (1962); *Great Northern R. Co.* v. *United States,* 315 U. S. 262, 273, 277 (1942); *Brewster* v. *Gage,* 280 U. S. 327, 337 (1930); *Tiger* v. *Western Investment Co.,* 221 U. S. 286, 309 (1911), here the question concerns the 1812 boundary between the United States and Louisiana, and in light of Art. IV, § 3, cl. 2, of the Constitution empowering Congress "to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States," we think the Act of 1848 and the events connected with its passage had special significance as a construction by the United States and Louisiana of the earlier act admitting Louisiana to the Union. Cf. *Washington* v. *Oregon,* 211 U. S., at 135. At least, the indications are clear enough to us that we shall not apply the rule of the thalweg in this case.

The Special Master also concluded that even if he was in error in rejecting Louisiana's claim with respect to the original location of her western boundary, Texas must still prevail by reason of prescription and acquiescence. Because we are satisfied with our conclusion, already reached, with respect to the boundary location, we need not pass upon this aspect of the Special Master's Report, although we note that the facts relied upon by him are consistent with and support the other ground for his conclusion as to Louisiana's Sabine boundary.

### III

With respect to islands in the Sabine it is conceded that Louisiana owns all islands in the eastern half of the river, whether existing in 1812 or thereafter formed. As to islands in the west half, the Special Master concluded that by virtue of the 1812 Act of Admission Louisiana owns all islands that then existed in that portion of the river, but rejected her claims to islands thereafter formed in the western half. All later formed islands in that half of the river, he concluded, belonged to the State of Texas.

We shall withhold judgment with respect to the ownership of islands in the western half of the Sabine River. Further proceedings with respect to these islands are contemplated in any event, and it is our view that the United States should be requested to present any claims it may have to any of the islands in the western half of the Sabine south of 32 degrees north latitude and, if it so desires, to present evidence and argument with respect to the ownership of such islands. The Special Master should then determine whether his Report in this respect should be modified and complete the proceedings with respect to the ownership of the Sabine islands. Our reasons for so directing will be briefly stated.

It is the unquestioned rule that States entering the Union acquire title to the lands under navigable streams and other navigable waters within their borders. *Scott v. Lattig,* 227 U. S. 229, 242–243 (1913); *County of St. Clair v. Lovingston,* 23 Wall. 46, 68 (1874); *Pollard's Lessee v. Hagan,* 3 How. 212, 228–230 (1845). But the rule does not reach islands or fast lands located within such waters. Title to islands remains in the United States, unless expressly granted along with the stream bed or otherwise. This was the express holding of *Scott v. Lattig, supra.*

In that case, a dispute arose over the ownership of an island located east of the thalweg of the Snake River, which was the western boundary of the State of Idaho. It appeared that after Idaho came into the Union, and thereby acquired title to the river bed on its side of the thalweg, the United States patented riparian lands opposite the island, and the patentees claimed the island under the laws of Idaho as against a settler seeking to homestead the property under the laws of the United States. The homesteader prevailed in this Court because title to the island remained in the United States:

> "But the island, which we have seen was in existence when Idaho became a State, was not part of the bed of the stream or land under the water, and therefore its ownership did not pass to the State or come within the disposing influence of its laws. On the contrary, although surrounded by the waters of the river and widely separated from the shore, it was fast dry land, and therefore remained the property of the United States and subject to disposal under its laws, as did the island which was in controversy in *Mission Rock Co. v. United States,* 109 Fed. Rep. 763, 769–770, and *United States v.*

*Mission Rock Co.,* 189 U. S. 391." 227 U. S., at 244.

In the case before us, it is probably correct that once the eastern boundary of Texas was extended to the middle of the river in 1848 that State became entitled to any islands in the west half which formed after the date of that extension. But unless the 1848 Act conveyed to Texas the islands located in the western half of the river at that time, title to those islands remained in the United States, if the United States had not previously conveyed all or part of them to Louisiana. The 1848 Act, however, does not mention islands in the Sabine, and it would therefore appear, if *Lattig* is to be followed, that the United States has an interest in any proceedings to determine the ownership of islands in the west half of the Sabine and should be a party to, or at least have the opportunity to participate in, such proceedings. Texas claims any such islands existing prior to 1848 by prescription and acquiescence, but, plainly, a State may not acquire property from the United States in this manner. *United States* v. *California,* 332 U. S. 19, 39–40 (1947).

We shall accordingly await the result of further proceedings before the Special Master with respect to the ownership of islands in the western portion of the Sabine. In all other respects, the exceptions of the parties are overruled and the report of the Special Master is confirmed.

*So ordered.*

MR. JUSTICE DOUGLAS, dissenting.

Louisiana was admitted into the Union in 1812. 2 Stat. 701. The Constitution of Louisiana of 1812 described her western boundary as "beginning at the mouth of the river Sabine, thence by a line to be drawn along the middle of said river, including all its islands, to the

thirty-second degree of latitude . . . ." That was the description [1] that was recited in the 1812 Act in which Congress approved the Constitution of Louisiana. 2 Stat. 702. There remained a controversy between this Nation and Spain over this western boundary and the Treaty of 1819 settled the question by the only authority that could establish a boundary with a foreign government. *Rhode Island* v. *Massachusetts,* 12 Pet. 657, 725.

That treaty provided that the boundary should start "at the mouth of the river Sabine, in the sea, continuing north, along the western bank of that river, to the 32d degree of latitude." 8 Stat. 252, 254, 256. When Texas was admitted to the Union in 1845, 9 Stat. 108, that same boundary was used to describe her eastern line. 8 Stat. 372, 374. The Treaty of 1828 recognized that as the boundary line between Louisiana and Texas for it was the boundary between the United States and Mexico, of which Texas was a part. 8 Stat. 372. Texas did not come into the Union until 1845. The Treaty of 1819 read in context means that Louisiana's western border, coinciding with that of the United States, was the western bank of the Sabine.

The 1819 Treaty does not mention Louisiana. But Louisiana along that segment of our western boundary was a buffer between this Nation and Spain. It is therefore dubious that the United States was bargaining for that narrow strip between the "middle" of the Sabine and the west bank of the Sabine as a detached, isolated piece of our public lands. Rather, it seems well-nigh conclusive that in 1819 this Nation was bargaining with Spain for a border that in part at least of its reach would be the western border of Louisiana.

---

[1] It was also in the Enabling Act giving Louisiana authority to form a constitution and state government and gain admission to the Union. 2 Stat. 641.

Louisiana claims that much and alternatively only the "middle" of the Sabine which, according to the thalweg doctrine, when describing boundaries on navigable waters, means the middle of the channel, which is not necessarily the geographical "middle." The thalweg doctrine had that meaning both when Louisiana was admitted to the Union [2] and since that time.[3]

Why then does Louisiana lose? Why is her boundary restricted?

The Court relies on the Act of Congress of July 5, 1848, 9 Stat. 245, which gave Texas permission to extend her eastern boundary "so as to include within her limits one half of Sabine Pass, one half of Sabine Lake, [and] one half of Sabine River."

*Washington* v. *Oregon,* 211 U. S. 127 (1908), makes clear that the boundary originally established when Louisiana was admitted to the Union "is not within the power of the National Government to change . . . without [Louisiana's] consent . . . ." *Id.,* at 131.

Given that legislative restraint, Congress had no power to take the west bank from Louisiana or, alternatively, it must have used "one-half" in a general, rather than a mathematical, sense, thereby granting to Texas only those areas lying west of the thalweg.

The Sabine River, Sabine Lake, and Sabine Pass are one continuous body of navigable water. Heretofore when in controversies between States the "middle" of a navigable stream has been described as the boundary, the middle of the channel is intended. *Iowa* v. *Illinois,* 147 U. S. 1, 7–8; *Arkansas* v. *Tennessee,* 246 U. S. 158, 173; *Minnesota* v. *Wisconsin,* 252 U. S. 273; *Wisconsin* v. *Michigan,* 295 U. S. 455.

---

[2] The earlier authorities are discussed at length in *Iowa* v. *Illinois,* 147 U. S. 1, 7–10 (1893).

[3] G. Thompson on Real Property § 3075 (1962 ed.); 3 American Law of Property § 12.27 n. 16 (A. Casner ed. 1952).

Mississippi, which was admitted to the Union five years after Louisiana, argued much as Texas does in this case to the effect that Congress had given her territory that Louisiana claimed under an earlier title. The Court held "[i]f it were true that . . . repugnancy between the two acts existed, it is enough to say that Congress, after the admission of Louisiana, could not take away any portion of that State and give it to the State of Mississippi." *Louisiana* v. *Mississippi,* 202 U. S. 1, 40. This reasoning is equally applicable to Louisiana's western border.

I conclude in the alternative that the thalweg doctrine—widely and generally accepted—has not been constitutionally displaced by statutory language in this case.

The question remains whether acts of acquiescence and prescription have since replaced the thalweg with some other boundary between Louisiana and Texas. Although the Special Master concluded that the maps and other evidence in question support both the conclusion that Louisiana has acquiesced in a mid-stream boundary, rather than the claimed west-bank boundary, and that the mid-stream boundary thus recognized is in the geographic center rather than the thalweg, I cannot agree. The vast majority of the maps in evidence do denominate a boundary between the banks of the waterways in issue. The quality of the boundary representation is, however, quite inadequate even to determine whether a geographic centerline designation was attempted. Moreover, the main channel is not depicted, so that any possible variance from the thread of the stream is incapable of determination.[4] Indeed, the language employed by the Master to describe these maps in the Appendix to his Report depicts this uncertainty; the terms "middle," "mid-Sabine," and "centerline" ap-

---

[4] See generally Texas Exs. A, F. But see Louisiana Ex. K.

pear to be used interchangeably, with only an occasional use of the more precise terminology "geographic middle." [5] Acquiescence on the part of one State or prescription on the part of another should not be predicated on such an inadequate showing.

The case should be returned to the Special Master for hearings that will thoroughly explore the factual issues concerning the alleged acquiescence or prescription.

---

[5] Report of Special Master, App. B.