## TEXAS *v.* LOUISIANA

No. 36, Orig. Argued January 19, 1976—Decided June 14, 1976

*John L. Hill,* Attorney General of Texas, argued the cause for plaintiff. With him on the briefs were *Elizabeth B. Levatino,* First Special Assistant Attorney General, *Daniel O. Goforth,* Special Assistant Attorney General, and *Larry F. York.*

*Oliver P. Stockwell,* Special Assistant Attorney General of Louisiana, argued the cause for defendant. With him on the briefs were *William J. Guste, Jr.,* Attorney General, *Warren E. Mouledoux* and *Gary Keyser,* Assistant Attorneys General, and *Emmett C. Sole,* Special Assistant Attorney General.

*John P. Rupp* argued the cause for the United States as intervenor. On the brief were *Solicitor General Bork, Acting Assistant Attorney General Kiechel, William L. Patton, Bruce C. Rashkow,* and *Michael W. Reed.*

PER CURIAM.

We have already decided that the relevant boundary between the States of Texas and Louisiana is the geo-

graphic middle of Sabine Pass, Sabine Lake, and Sabine River from the mouth of the Sabine in the Gulf of Mexico to the thirty-second degree of north latitude. 410 U. S. 702 (1973). We have also held that all islands in the east half of the Sabine River when Louisiana was admitted as a State in 1812, or thereafter formed, belong to Louisiana. Delimitation of the boundary and decision as to ownership of the islands in the west half of the Sabine were deferred pending further proceedings before the Special Master in which the United States was invited to participate. *Id.*, at 712–714.

The litigation subsequently was enlarged upon the motion of Louisiana to include a determination of the lateral seaward boundary between Texas and Louisiana, and Texas and the United States extending into the Gulf of Mexico. 414 U. S. 904 (1973).[1] Pleadings relating to the lateral boundary were filed by the States and by the United States. The United States also claimed title to six of the islands in the western half of the Sabine, 414 U. S. 1107 (1973); it subsequently amended its complaint, however, to withdraw its claim to all islands except one identified as "Sam." 416 U. S. 903 (1974). The city of Port Arthur, Tex., was permitted to intervene for purposes of protecting its interests in the island claims of the United States. 416 U. S. 965 (1974).

---

[1] We held in *United States* v. *Louisiana*, 363 U. S. 1 (1960), that under the Submerged Lands Act, 67 Stat. 29, 43 U. S. C. § 1301 *et seq.*, Texas as against the United States was entitled to the natural resources of the seabed and subsoil extending three marine leagues from its coastline into the Gulf, but that Louisiana may claim such rights only for a distance of three geographical miles from its coastline. Thus, for three geographical miles Texas and Louisiana are in dispute as to the location of their boundary. The remaining boundary area out to three marine leagues is in dispute between Texas and the United States.

After hearings on referral, the Special Master has concluded and recommends:

"1) That the boundary between the States of Texas and Louisiana from 32° to 30° north latitude be established as shown upon Texas Exhibit AAA 1–12, pursuant to agreement of the parties.

"2) That the boundary line from 30° north latitude to the Gulf of Mexico and to the terminus of the jetties be established as being the median line marked on Louisiana Exhibits DDD and III and hereinabove described specifically, with the right to the States of Texas and Louisiana to alter such boundary within Sabine Lake by agreement within the time proposed.

"3) That the claim of the United States of America to an island named 'Sam' be denied.

"4) That the lateral boundary in the Gulf of Mexico between the States of Texas and Louisiana and between the State of Texas and the United States of America be established as the line shown on your Special Master's Exhibit and marked 'U. S.'

"5) That the cost be taxed to the parties in accordance with their contribution to the fund established by your Special Master and deposited in the First National Bank & Trust Company, Lincoln, Nebraska; that no costs be taxed for the services of your Special Master herein; that upon the order of termination of this case your Special Master file a report setting forth the amount of money received by him from the parties for the payment of costs and expenses pursuant to his requests and of the disbursement thereof for approval by the Court unless prior thereto the parties in writing have approved your Special Master's report as to the disbursement of said moneys."

Exceptions to the recommendations of the Special Master have been filed by Louisiana and Texas. 423 U. S. 909 (1975).

At approximately 30° north latitude, the Sabine River enters into Sabine Lake through three channels. Louisiana excepts to that portion of the Special Master's report which marks the boundary line between the States through the passage more recently known as "middle pass," instead of in the geographic middle of the "west pass." Louisiana contends that the Special Master acted contrary to our rejection of the thalweg doctrine earlier in this case, 410 U. S., at 709, by considering navigation as the criterion to locate the boundary in the middle channel. We think it clear, however, that the Special Master makes reference to the volume of water flowing through these passes solely in an analytic context reflecting the history and geography of the region. We are persuaded that the Special Master made his determination consistent with our earlier holding.

Texas has filed exceptions to the Special Master's delimitation of the lateral seaward boundary in the Gulf of Mexico. Texas argues that the Special Master erred in concluding that Texas and Louisiana did not have a historic boundary in the Gulf; we think that misreads the findings of the Special Master. The Special Master does not reject Texas' contention that there was a historic "inchoate" boundary; what he concludes is that there has never been an *established* offshore boundary between the States. We find the Special Master correct in his conclusion and conclude that he properly considered how such a boundary should be now constructed.

All parties agree that the lateral seaward boundary is to be constructed by reference to the median line, or equidistant principle, recognized in the 1958 Geneva Convention on the Territorial Sea and the Contiguous Zone, [1964] 15 U. S. T. (pt. 2) 1606, T. I. A. S. No.

5639.[2]  Texas, however, excepts to the Special Master's determination that the equidistant principle is to be applied to the coastlines of the States as affected by jetties at the mouth of the Sabine River.[3]  Texas urges that the relevant coastline is the coastline that existed in 1845 when it was admitted to the Union.  Texas argues that this is a domestic dispute involving historical precedents and that the States' offshore boundary should be constructed as Congress would have done in 1845 had it considered the matter.

The short answer to Texas' argument is that no line was drawn by Congress and that the boundary is being described in this litigation for the first time.  The Court

---

[2] Article 12 of the Convention provides:

"1. Where the coasts of two States are opposite or adjacent to each other, neither of the two States is entitled, failing agreement between them to the contrary, to extend its territorial sea beyond the median line every point of which is equidistant from the nearest points on the baselines from which the breadth of the territorial seas of each of the two States is measured.  The provisions of this paragraph shall not apply, however, where it is necessary by reason of historic title or other special circumstances to delimit the territorial seas of the two States in a way which is at variance with this provision.

"2. The line of delimitation between the territorial seas of two States lying opposite to each other or adjacent to each other shall be marked on large-scale charts officially recognized by the coastal States."  [1964] 15 U. S. T. (pt. 2), at 1610, T. I. A. S. No. 5639.

[3] There are two jetties—one originating from Texas and one from Louisiana—and each extending approximately 3.1 miles into the Gulf.  The jetties were constructed by the United States Army Corps of Engineers in the 1880's to provide an adequate ship canal to the Sabine Pass for the benefit of such cities as Port Arthur, Beaumont, and others.  They were completed to their present terminus in 1936.

Article 8 of the Convention provides:

"For the purpose of delimiting the territorial sea, the outermost permanent harbour works which form an integral part of the harbour system shall be regarded as forming part of the coast."  *Id.*, at 1609, T. I. A. S. No. 5639.

should not be called upon to speculate as to what Congress might have done. We hold that the Special Master correctly applied the Convention on the Territorial Sea and Contiguous Zone to this suit. As we previously have recognized, "the comprehensiveness of the Convention provides answers to many of the lesser problems related to coastlines which, absent the Convention, would be most troublesome." *United States* v. *California*, 381 U. S. 139, 165 (1965). When read together, Arts. 12 and 8 of the Convention clearly require that the median line be measured with reference to the jetties.[4]

Accordingly, the exceptions of Louisiana and Texas are overruled. The parties are directed within 90 days to submit a proposed decree which has the approval of the Special Master. If the States cannot agree, the Special Master is requested, after appropriate hearings, to prepare and submit a recommended decree.

---

[4] The result is not inconsistent with our holding in *United States* v. *Louisiana*, 389 U. S. 155 (1967), that Texas' three-league grant under the Submerged Lands Act is measured from Texas' historic coastline, without reference to the jetties. We had earlier held that the coastal States had no claim to the submerged lands off their coastlines and that the United States had paramount rights in these lands. *United States* v. *California*, 332 U. S. 19 (1947). This holding was applied to Louisiana and Texas in our first Louisiana decision. *United States* v. *Louisiana*, 339 U. S. 699 (1950). In our 1967 Louisiana decision, *supra*, we were concerned only with interpretation of the statutory grant of the Submerged Lands Act. We concluded that "[n]o definitions are required by this Court and there is no need to resort to international law; Texas has simply been given that amount of submerged land it owned when it entered the Union." 389 U. S., at 160.