Justice Alito
delivered the opinion of the Court.
The State of South Carolina brought this original action against the State of North Carolina, seeking an equitable apportionment of the Catawba River. We appointed a Special Master and referred the matter to her, together with the motions of three nonstate entities seeking to intervene in the dispute as parties. South Carolina opposed the motions. After holding a hearing, the Special Master granted the motions and, upon South Carolina’s request, memorialized the reasons for her decision in a First Interim Report. South Carolina then presented exceptions, and we set the matter for argument.
Two of the three proposed intervenors have satisfied the standard for intervention in original actions that we articulated nearly 60 years ago in New Jersey v. New York, 345 U. S. 369 (1953) (per curiam). Accordingly, we overrule South Carolina’s exceptions with respect to the Catawba River Water Supply Project (hereinafter CRWSP) and Duke Energy Carolinas, LLC (hereinafter Duke Energy), but we sustain South Carolina’s exception with respect to the city of Charlotte, North Carolina (hereinafter Charlotte).
I
A
We granted leave for South Carolina to file its complaint in this matter two years ago. South Carolina v. North Carolina, 552 U. S. 804 (2007). The gravamen of the complaint is that North Carolina has authorized upstream transfers of water from the Catawba River basin that exceed North Carolina’s equitable share of the river. It has done so, according to the complaint, pursuant to a North Carolina statute that *260 requires any person seeking to transfer more than 2 million gallons of water per day (mgd) from the Catawba River basin to obtain a permit from the North Carolina Environmental Management Commission. See N. C. Gen. Stat. Ann. § 143-215.22L(a)(1) (Lexis 2007); § 143-215.22G(1)(h). Through that agency, the complaint alleges, North Carolina has issued at least two such permits, one to Charlotte for the transfer of up to 33 mgd, and one to the North Carolina cities of Concord and Kannapolis for the transfer of 10 mgd. In addition, the complaint alleges, North Carolina’s permitting statute “grandfathers” a 5 mgd transfer by the CRWSP, and “implicitly authorize[s]” an unknown number of transfers of less than 2 mgd. Complaint ¶¶ 18, 21, 22. South Carolina claims that the net effect of these upstream transfers is to deprive South Carolina of its equitable share of the Catawba River’s water, particularly during periods of drought or low river flow.
South Carolina seeks relief in the form of a decree that equitably apportions the Catawba River between the two States, enjoins North Carolina from authorizing transfers of water from the Catawba River exceeding that State’s equitable share, and declares North Carolina’s permitting statute invalid to the extent it is used to authorize transfers of water from the Catawba River that exceed North Carolina’s equitable share. See generally Complaint, Prayer for Relief ¶¶ 1-3. The complaint does not specify a minimum flow of water that would satisfy South Carolina’s equitable needs, but it does offer a point of reference. In a recent “multistakeholder negotiation process” involving the Federal Energy Regulatory Commission (hereinafter FERC), Duke Energy, and various groups from both States, it was agreed, according to the complaint, that South Carolina should receive from the Catawba River a continuous flow of water of no less than 1,100 cubic feet per second, or about 711 mgd. Complaint ¶ 14.
*261 This negotiated figure may prove unattainable. According to the complaint, natural conditions and periodic fluctuations have caused the Catawba River’s flow to fall below 1,100 cubic feet per second. Duke Energy, which generates hydroelectric power from a series of reservoirs on the Catawba River, developed a model to estimate the river’s flow if the river were not impounded. Id., ¶¶8, 16. The complaint notes that according to Duke Energy’s model, the Catawba River — even in its natural state — often would not deliver into South Carolina a minimum average daily flow of 1,100 cubic feet per second. Id., ¶ 16; App. to Motion of State of South Carolina for Leave To File Complaint, Complaint, and Brief in Support of its Motion for Leave To File Complaint 18. South Carolina contends that North Carolina’s authorization of large transfers of water from the Catawba River basin has exacerbated these conditions.
Shortly after we granted leave to file the complaint, two of the entities named in the complaint — the CRWSP and Duke Energy — filed motions for leave to intervene as parties. The CRWSP sought leave to intervene as a party-defendant, asserting its interest as a “riparian user of the Catawba River” and claiming that this interest was not adequately represented because of the CRWSP’s “interstate nature.” Motion of CRWSP for Leave To Intervene and Brief in Support of Motion 8, 9. Specifically, the CRWSP noted that it is a bistate entity that is jointly owned and regulated by, and supplies water to, North Carolina’s Union County and South Carolina’s Lancaster County. Id., at 9. Duke Energy sought leave to intervene and file an answer, asserting an interest as the operator of 11 dams and reservoirs on the Catawba River that control the river’s flow, as the holder of a 50-year license[1] governing Duke Energy’s hydroelectric *262 power operations, and as the entity that orchestrated the multistakeholder negotiation process culminating in a Comprehensive Relicensing Agreement (CRA) signed by 70 entities from both States in 2006. Duke Energy’s Motion and Brief in Support of Motion To Intervene and File Answer, and Answer 2, 5. This CRA set forth the terms under which Duke Energy has applied to renew its FERC license, id., at 5, and Duke Energy asserted that neither State would represent its “particular amalgam of federal, state and private interests,” id., at 14. South Carolina opposed both motions, and we referred them to the Special Master. 552 U. S. 1160 (2008).
One month later, a third entity named in the complaint, the city of Charlotte, also sought leave to intervene as a party-defendant. In its brief, Charlotte asserted an interest, both as the holder of a permit authorizing the transfer of 33 mgd from the Catawba River basin — the largest single transfer identified in the complaint — and as the potential source of the 10 mgd transfer approved for the cities of Concord and Kannapolis. Motion for Leave To Intervene of City of Charlotte, North Carolina, and Brief in Support of Motion 5, 7.[2] Charlotte argued that North Carolina could not represent the city’s interests effectively because the State was dutybound to represent the interests of all North Carolina users of the Catawba River’s water, including users whose interests were not aligned with Charlotte’s. Id., at 17. South Carolina also opposed Charlotte’s motion, and we referred it to the Special Master. 552 U. S. 1254 (2008).
*263 B
The Special Master held a hearing and issued an order granting all three motions for leave to intervene. At South Carolina’s request, the Special Master set forth her findings and decision as a First Interim Report, and it is this Report to which South Carolina now presents exceptions.
The Special Master recognized that this Court has exercised jurisdiction over nonstate parties in original actions between two or more States. She also recognized that in New Jersey v. New York, 345 U. S. 369, the Court considered the “appropriate standard” for a nonstate entity’s motion to intervene in an original action. First Interim Report of Special Master, O. T. 2008, No. 138, Orig., p. 12 (First Interim Rept.). But in attempting to give context to our standard, she looked beyond intervention and considered original actions in which the Court has allowed nonstate entities to be named as defendants by the complaining State. From those examples, the Special Master “distilled the following rule” governing motions to intervene in original actions by non-state entities:
“Although the Court’s original jurisdiction presumptively is reserved for disputes between sovereign states over sovereign matters, non-state entities may become parties to such original disputes in appropriate and compelling circumstances, such as where the non-state entity is the instrumentality authorized to carry out the wrongful conduct or injury for which the complaining state seeks relief, where the non-state entity has an independent property interest that is directly implicated by the original dispute or is a substantial factor in the dispute, where the non-state entity otherwise has a ‘direct stake’ in the outcome of the action within the meaning of the Court’s cases discussed above, or where, together with one or more of the above circumstances, the *264 presence of the non-state entity would advance the 'full exposition’ of the issues.” Id., at 20-21.
Applying this broad rule, the Special Master found that each proposed intervenor had a sufficiently compelling interest to justify intervention. The Special Master rejected South Carolina’s proposal to limit intervention to the remedy phase of this litigation and recommended that this Court grant the motions to intervene.
II
A
Participation by nonstate parties in actions arising under our original jurisdiction is not a new development. Article III, § 2, of the Constitution expressly contemplates suits “between a State and Citizens of another State” as falling within our original jurisdiction, see, e. g., Georgia v. Brailsford, 2 Dall. 402 (1792), and for more than two centuries the Court has exercised that jurisdiction over nonstate parties in suits between two or more States, see New York v. Connecticut, 4 Dall. 1 (1799); Missouri v. Illinois, 180 U. S. 208, 224-225 (1901). Nonstate entities have even participated as parties in disputes between States, such as the one before us now, where the States were seeking equitable apportionment of water resources. See, e. g., Arizona v. California, 460 U. S. 605, 608, n. 1 (1988); Texas v. New Mexico, 343 U. S. 932 (1952); New Jersey v. City of New York, 279 U. S. 823 (1929) (per curiam). It is, thus, not a novel proposition to accord party status to a citizen in an original action between States.
This Court likewise has granted leave, under appropriate circumstances, for nonstate entities to intervene as parties in original actions between States for nearly 90 years. See Maryland v. Louisiana, 451 U. S. 725, 745, n. 21 (1981). In Oklahoma v. Texas, 258 U. S. 574, 581, 598 (1922), a boundary dispute that threatened to erupt in armed hostilities, the Court allowed individual and corporate citizens to intervene *265 to protect their rights in contested land. See, e. g., Oklahoma v. Texas, 254 U. S. 609 (1920).[3] More recently, the Court has allowed a municipality to intervene in a sovereign boundary dispute, see Texas v. Louisiana, 426 U. S. 465, 466 (1976) (per curiam), and has permitted private corporations to intervene in an original action challenging a State’s imposition of a tax that burdened interstate commerce and contravened the Supremacy Clause, see Maryland v. Louisiana, supra, at 745, n. 21;
In this case, the Special Master crafted a rule of intervention that accounts for the full compass of our precedents. But a compelling reason for allowing citizens to participate in one original action is not necessarily a compelling reason for allowing citizens to intervene in all original actions. We therefore decline to adopt the Special Master’s proposed rule. As the Special Master acknowledged, the Court in New Jersey v. New York, supra, set down the “appropriate standard” for intervention in original actions by nonstate entities. First Interim Rept. 12. We believe the standard that we applied in that case applies equally well here.[4]
In 1929, the State of New Jersey sued the State of New York and city of New York for their diversion of the Dela *266 ware River’s headwaters. 345 U. S., at 370. The Court granted the Commonwealth of Pennsylvania leave to intervene and, in 1931, entered a decree enjoining certain diversions of water by the State of New York and the city of New York. Id., at 371. In 1952, the city of New York moved to modify the decree, and New Jersey and Pennsylvania filed oppositions. After the Court referred the matter to a Special Master, the city of Philadelphia sought leave to intervene on the basis of its use of the Delaware River’s water. Id., at 371-372.
This Court denied Philadelphia leave to intervene. Pennsylvania had intervened pro interesse suo “to protect the rights and interests of Philadelphia and Eastern Pennsylvania in the Delaware River.” Id., at 374; see also New Jersey v. New York, 283 U. S. 336, 342 (1931). In view of Pennsylvania’s participation, the Court wrote that when a State is “a party to a suit involving a matter of sovereign interest,” it is parens patriae and “ ‘must be deemed to represent all [of] its citizens.’” 345 U. S., at 372-373 (quoting Kentucky v. Indiana, 281 U. S. 163, 173-174 (1930)). This principle serves the twin purposes of ensuring that due respect is given to “sovereign dignity” and providing “a working rule for good judicial administration.” 345 U. S., at 373. The Court, thus, set forth the following standard governing intervention in an original action by a nonstate entity:
“An intervenor whose state is already a party should have the burden of showing some compelling interest in his own right, apart from his interest in a class with all other citizens and creatures of the state, which interest is not properly represented by the state.” Ibid.
On several subsequent occasions the Court has reaffirmed this “general rule.” See Nebraska v. Wyoming, 515 U. S. 1, 21-22 (1995); United States v. Nevada, 412 U. S. 534, 538 (1973) (per curiam); Illinois v. Milwaukee, 406 U. S. 91, 97 (1972).
*267 We acknowledge that the standard for intervention in original actions by nonstate entities is high — and appropriately so. Such actions tax the limited resources of this Court by requiring us “awkwardly to play the role of factfinder” and diverting our attention from our “primary responsibility as an appellate tribunal.” Ohio v. Wyandotte Chemicals Corp., 401 U. S. 493, 498 (1971); Maryland v. Louisiana, 451 U. S. 725, 762 (1981) (Rehnquist, J., dissenting). In order to ensure that original actions do not assume the “dimensions of ordinary class actions,” New Jersey v. New York, 345 U. S., at 373, we exercise our original jurisdiction “sparingly” and retain “substantial discretion” to decide whether a particular claim requires “an original forum in this Court,” Mississippi v. Louisiana, 506 U. S. 73, 76 (1992) (internal quotation marks omitted).
Respect for state sovereignty also calls for a high threshold to intervention by nonstate parties in a sovereign dispute committed to this Court’s original jurisdiction. Under 28 U. S. C. § 1251, this Court exercises “original and exclusive” jurisdiction to resolve controversies between States that, if arising among independent nations, “would be settled by treaty or by force.” Kansas v. Colorado, 206 U. S. 46, 98 (1907). This Court has described its original jurisdiction as “delicate and grave,” Louisiana v. Texas, 176 U. S. 1, 15 (1900), and has guarded against its use as a forum in which “a state might be judicially impeached on matters of policy by its own subjects,” New Jersey v. New York, supra, at 373. In its sovereign capacity, a State represents the interests of its citizens in an original action, the disposition of which binds the citizens. Nebraska v. Wyoming, supra, at 22; New Jersey v. New York, 345 U. S., at 372-373. A respect for sovereign dignity, therefore, counsels in favor of restraint in allowing nonstate entities to intervene in such disputes. See ibid.; accord, United States v. Texas, 143 U. S. 621, 643 (1892) (“[Exclusive jurisdiction was given to this court, because it best comported with the dignity of a State, that a *268 ease in which it was a party should be determined in the highest, rather than in a subordinate judicial tribunal of the nation”).[5]
That the standard for intervention in original actions by nonstate entities is high, however, does not mean that it is insurmountable. Indeed, as the Special Master correctly recognized, our practice long has been to allow such intervention in compelling circumstances. See Oklahoma v. Texas, 258 U. S., at 581. Over the “strong objections” of three States, for example, the Court allowed Indian tribes to intervene in a sovereign dispute concerning the equitable apportionment of the Colorado River. Arizona v. California, 460 U. S., at 613. The Court did so notwithstanding the Tribes’ simultaneous representation by the United States. Id., at 608-609, 612. And in a boundary dispute among Texas, Louisiana, and the United States, the Court allowed the city of Port Arthur, Texas, to intervene for the purpose of protecting its interests in islands in which the United States claimed title. Texas v. Louisiana, 426 U. S., at 466; Texas v. Louisiana, 416 U. S. 965 (1974). In both of these examples, the Court found compelling interests that warranted allowing nonstate entities to intervene in original actions in which the intervenors were nominally represented by sovereign parties.
B
1
Applying the standard of New Jersey v. New York, supra, here, we conclude that the CRWSP has demonstrated a suf *269 ficiently compelling interest that is unlike the interests of other citizens of the States. The CRWSP is an unusual municipal entity, established as a joint venture with the encouragement of regulatory authorities in both States and designed to serve the increasing water needs of Union County, North Carolina, and Lancaster County, South Carolina. It has an advisory board consisting of representatives from both counties, (¿raws its revenues from its bistate sales, and operates infrastructure and assets that are owned by both counties as tenants-in-common. We are told that approximately 100,000 individuals in each State receive their water from the CRWSP and that “roughly half” of the CRWSP’s total withdrawals of water from the Catawba River go to South Carolina consumers. Reply of CRWSP to Exceptions of South Carolina to First Interim Report of Special Master 22 (hereinafter CRWSP Reply). It is difficult to conceive of a more purely bistate entity.
In addition, the CRWSP relies upon authority granted by both States to draw water from the Catawba River and transfer that water from the Catawba River basin. The CRWSP draws all of its water from an intake located below the Lake Wylie dam in South Carolina. South Carolina licensed the CRWSP to withdraw a total of 100 mgd from the Catawba River and issued a certificate to the CRWSP in 1989 authorizing up to 20 mgd to be transferred out of the Catawba River basin. Id., at 6-7; Answer to Bill of Complaint ¶ 21. Lancaster County currently uses approximately 2 mgd of this amount, Union County uses approximately 5 mgd, and the remaining 18 mgd are not used at this time. CRWSP Reply 7. The CRWSP pumps Union County’s allocation across the state border pursuant to a parallel certificate issued by North Carolina authorizing a 5 mgd transfer, ibid., and the complaint specifically identifies this transfer as contributing to South Carolina’s harm, Complaint ¶21. Thus, the CRWSP’s activities depend upon authority conferred by both States.
*270 On these facts, we think it is clear that the CRWSP has carried its burden of showing a compelling interest in the outcome of this litigation that distinguishes the CRWSP from all other citizens of the party States. See New Jersey v. New York, 345 U. S., at 373. Apart from its interest as a user of the Catawba River’s water, the CRWSP has made a $30 million investment in its plant and infrastructure, with each participating county incurring approximately half of this cost as debt. Each county is responsible for one-half of the CRWSP’s cost of operations, and the venture is designed to break even from year to year. Any disruption to the CRWSP’s operations would increase — not lessen — the difficulty of our task in achieving a “just and equitable” allocation in this dispute. See Nebraska v. Wyoming, 325 U. S. 589, 618 (1945). We believe that the CRWSP has shown a compelling interest in protecting the viability of its operations, which are premised on a fine balance between the joint venture’s two participating counties.
We are further persuaded that neither State can properly represent the interests of the CRWSP in this litigation. See New Jersey v. New York, supra, at 373. The complaint attributes a portion of the total water transfers that have harmed South Carolina to the CRWSP, yet North Carolina expressly states that it “cannot represent the interests of the joint venture.” Tr. of Oral Arg. 54. A moment’s reflection reveals why this is so. In this dispute, as in all disputes over limited resources, each State maximizes its equitable share of the Catawba River’s water only by arguing that the other State’s equitable share must be reduced. See, e. g., Colorado v. New Mexico, 459 U. S. 176, 186-187 (1982). It is thus likely that North Carolina, in response to South Carolina’s demand for a greater share of the Catawba River’s water, will take the position that downstream users — such *271 as Lancaster County[6] — should receive less water. See Tr. of Oral Arg. 52 (“From North Carolina’s perspective, South Carolina is receiving much more water under this negotiated agreement than they could ever hope to achieve in an equitable apportionment action”). The stresses that this litigation would place upon the CRWSP threaten to upset the fine balance on which the joint venture is premised, and neither State has sufficient interest in maintaining that balance to represent the full scope of the CRWSP’s interests.
Accordingly, we believe that the CRWSP should be allowed to intervene to represent its own compelling interests in this litigation. We thus overrule South Carolina’s exception.
2
We conclude, as well, that Duke Energy has demonstrated powerful interests that likely will shape the outcome of this litigation. To place these interests in context, it is instructive to consider the “flexible” process by which we arrive at a “ ‘just and equitable’ apportionment” of an interstate stream. Colorado v. New Mexico, supra, at 183. We do not approach the task in formulaic fashion, New Jersey v. New York, 283 U. S., at 343, but we consider “all relevant factors,” including, but not limited to:
“ ‘physical and climatic conditions, the consumptive use of water in the several sections of the river, the character and rate of return flows, the extent of established *272 uses, the availability of storage water, the practical effect of wasteful uses on downstream areas, [and] the damage to upstream areas as compared to the benefits to downstream areas if a limitation is imposed on the former.’ ” Colorado v. New Mexico, supra, at 183 (quoting Nebraska v. Wyoming, supra, at 618).
In performing this task, there is no substitute for “ ‘the exercise of an informed judgment,’” Colorado v. New Mexico, supra, at 183, and we will not hesitate to seek out the most relevant information from the source best situated to provide it. See Maryland, v. Louisiana, 451 U. S., at 745, n. 21 (allowing intervention of private pipeline companies “in the interest of a full exposition of the issues”).
With these considerations in mind, we turn to Duke Energy’s asserted interests. Duke Energy operates 11 dams and reservoirs in both States that generate electricity for the region and control the flow of the river. The complaint itself acknowledges the relationship between river flow and Duke Energy's operations, noting that a severe drought that ended in 2002 forced Duke Energy to “reduce dramatically” its hydroelectric power generation from the Catawba River. Complaint ¶ 17(c). It is likely that any equitable apportionment of the river will need to take into account the amount of water that Duke Energy needs to sustain its operations and provide electricity to the region, thus giving Duke Energy a strong interest in the outcome of this litigation. See Colorado v. New Mexico, supra, at 188 (noting the appropriateness of considering “the balance of harm and benefit that might result” from a State’s proposed diversion of a river). There is, moreover, no other similarly situated entity on the Catawba River, setting Duke Energy’s interests apart from the class of all other citizens of the States. See New Jersey v. New York, 345 U. S., at 373.
Just as important, Duke Energy has a unique and compelling interest in protecting the terms of its existing FERC *273 license and the CRA that forms the basis of Duke Energy’s pending renewal application.[7] Through its dams, Duke Energy controls the flow of the Catawba River under the terms of its 50-year FERC license, which regulates the very subject matter in dispute: the river’s minimum flow into South Carolina. See Order Issuing License (Major), Duke Power Co., Project No. 2232, 20 F. P. C. 360, 371-372 (1958) (Arts. 31 and 32). The CRA, likewise, represents the full consensus of 70 parties from both States regarding the appropriate minimum continuous flow of Catawba River water into South Carolina under a variety of natural conditions and, in times of drought, the conservation measures to be taken by entities that withdraw water from the Catawba River. These factors undeniably are relevant to any “just and equitable apportionment” of the Catawba River, see Colorado v. New Mexico, 459 U. S., at 183, and we are likely to consider them in reaching our ultimate disposition of this case. Thus, we find that Duke Energy has carried its burden of showing unique and compelling interests.
We also have little difficulty in concluding that neither State sufficiently represents these compelling interests. Neither State has signed the CRA or expressed an intention to defend its terms. To the contrary, North Carolina has expressed an intention to seek its modification. Tr. of Oral Arg. 51-52. Given the importance of Duke Energy’s interests and their relevance to our ultimate decision, we believe these interests should be represented by a party in this action, and we find that neither State is situated to do so properly. We believe that Duke Energy should be permitted to represent its own interests.
For these reasons, we agree with the Special Master that Duke Energy should be permitted to intervene, and we overrule South Carolina’s exception in that regard.
*274 3
We conclude, however, that Charlotte has not carried its burden of showing a sufficient interest for intervention in this action. Charlotte is a municipality of North Carolina, and for purposes of this litigation, its transfers of water from the Catawba River basin constitute part of North Carolina’s equitable share. While it is true that the complaint names Charlotte as an entity authorized by North Carolina to carry out a large transfer of water from the Catawba River basin, the complaint does not seek relief against Charlotte directly. Rather, the complaint seeks relief against all North Carolina-authorized transfers of water from the Catawba River basin, “past or future,” in excess of North Carolina’s equitable share. Complaint, Prayer for Relief ¶2. Charlotte, therefore, occupies a class of affected North Carolina users of water, and the magnitude of Charlotte’s authorized transfer does not distinguish it in kind from other members of the class. See New Jersey v. New York, supra, at 373, and n. (noting that Philadelphia represented half of Pennsylvania’s citizens in the watershed). Nor does Charlotte represent interstate interests that fall on both sides of this dispute, as the CRWSP does, such that the viability of Charlotte’s operations in the face of this litigation is called into question. Its interest is solely as a user of North Carolina’s share of the Catawba River’s water.
Charlotte’s interest falls squarely within the category of interests with respect to which a State must be deemed to represent all of its citizens. As we recognized in New Jersey v. New York, a State’s sovereign interest in ensuring an equitable share of an interstate river’s water is precisely the type of interest that the State, as parens patriae, represents on behalf of its citizens. See also United States v. Nevada, 412 U. S., at 539; Nebraska v. Wyoming, 325 U. S., at 616. That is why, in New Jersey v. New York, supra, we required that a proposed intervenor show a compelling interest “in his own right,” distinct from the collective interest of “all other citi *275 zens and creatures of the state,” whose interest the State presumptively represents in matters of sovereign policy. Id., at 373. We conclude that Charlotte has not carried that burden. Thus, respect for “sovereign dignity” requires us to recognize that North Carolina properly represents Charlotte in this dispute over a matter of uniquely sovereign interest. See ibid.
North Carolina’s own statements only reinforce this conclusion. North Carolina has said that it will defend Charlotte’s authorized 33 mgd transfer. Tr. of Oral Arg. 52-53. The State expressly disagrees with Charlotte’s assertion that the city’s interest is not adequately represented by the State. Brief for State of North Carolina in Opposition to Plaintiff’s Exceptions 22. Indeed, in response to Charlotte’s motion to intervene, North Carolina wrote the following:
“[T]he State must represent the interests of every person that uses water from the North Carolina portion of the Catawba River basin. In fact, the State has a particular concern for its political subdivisions, such as Charlotte, which actually operate the infrastructure to provide water to the State’s citizens.... The State has every reason to defend the [transfers] that it has authorized for the benefit of its citizens. The State cannot agree with any implication that because it represents all of the users of water in North Carolina it cannot, or will not[,] represent the interests of Charlotte in this litigation initiated by South Carolina.” Brief for State of North Carolina in Response to City of Charlotte’s Motion for Leave To Intervene and File Answer 1-2, ¶ 1.
These statements are consistent with North Carolina’s role as parens patriae, and we see no reason that North Carolina cannot represent Charlotte’s interest in this sovereign dispute. See New Jersey v. New York, 345 U. S., at 374 (noting that Philadelphia’s interest “is invariably served by the Commonwealth’s position”).
*276 Because we are not persuaded that Charlotte’s interest is sufficiently unique and not properly represented by North Carolina to require the city’s intervention as a party in this litigation, we sustain South Carolina’s exception.[8]
III
We thus overrule South Carolina’s exceptions to the Special Master’s First Interim Report with respect to the CRWSP and Duke Energy, but we sustain South Carolina’s exception with respect to Charlotte.

It is so ordered.

 The license was issued in 1958 to Duke Energy’s predecessor by the Federal Power Commission, a predecessor of the FERC. For convenience, we will refer to Duke Energy’s “FERC license” herein.

 Charlotte also asserted an interest in protecting the terms of the CRA, to which Charlotte was a signatory but to which North Carolina, which has conflicting duties under § 401 of the Clean Water Act, 86 Stat. 877, as added, 33 U. S. C. § 1341, was not. North Carolina opposed this argument, and the Special Master did not rely on it in recommending that Charlotte’s motion to intervene should be granted. As Charlotte does not reassert this argument here, we do not consider it.

 The Chief Justice argues against drawing conclusions from the intervention that we allowed in Oklahoma v. Texas, 254 U. S. 609 (1920). See post, at 283 (opinion concurring in judgment in part and dissenting in part). But the circumstances surrounding that dispute fit the “'model case’ ” for invoking this Court’s original jurisdiction, post, at 277, and counsel against inferring from our precedents, as The Chief Justice does with respect to equitable apportionment actions, a rule against nonstate intervention in such “weighty controversies,” ibid.

 Accordingly, we need not decide South Carolina’s first exception to the Special Master’s conclusion that intervention is proper “whenever the movant is the 'instrumentality’ authorized to engage in conduct alleged to harm the plaintiff State, has an ‘independent property interest’ at issue in the action, or otherwise has a 'direct stake’ in the outcome of the action.” Exceptions of State of South Carolina to First Interim Report of Special Master and Brief in Support of Exceptions i.

 South Carolina has not invoked the Eleventh Amendment as a basis for opposing intervention. It has noted, however, that the proposed intervenors’ claims are, in effect, against South Carolina, and thus has reserved the right to argue that the Eleventh Amendment bars particular forms of relief sought by the proposed intervenors. As in New Jersey v. New York, 345 U. S. 369, 372 (1953) (per curiam), we express no view whether the Eleventh Amendment is implicated where a nonstate entity seeks to intervene as a defendant in an original action over a State’s objection.

 As a further complication, we are told, Lancaster County has an obligation to provide water service to certain customers in Mecklenburg County, North Carolina. CRWSP Reply 6. Thus, South Carolina may not be interested in protecting all uses of Lancaster County’s share of the CRWSP’s water. This additional intermingling of state interests further supports our conclusion that neither State adequately represents the CRWSP’s inherently bistate interests.

 Duke Energy is operating under a temporary extension of its 50-year FERC license, which expired in 2008, and the CRA represents Duke Energy’s investment in a new 50-year license.

 Federal Rule of Civil Procedure 24 does not require a contrary result. This Court’s Rule 17.2 allows the Federal Rules of Civil Procedure to be taken as “guides” to procedure in original actions. See Arizona v. California, 460 U. S. 605, 614 (1983). Even if we were to look to the standard for intervention of right in civil matters, Charlotte would not be entitled to intervene in this dispute because an existing party — North Carolina — adequately represents Charlotte’s interest. See Fed. Rule Civ. Proc. 24(a)(2). To the extent that the standard for permissive intervention may be an appropriate guide when a movant presents a sufficiently “important but ancillary concern,” see Arizona, supra, at 614-616, we find no such concern here. North Carolina’s adequate representation of Charlotte and the heightened standard for intervention in original actions, see New Jersey v. New York, 345 U. S., at 373, persuade us not to apply the standard for permissive intervention set forth in Federal Rule of Civil Procedure 24(b)(1)(B).