[No. 69417-6.   En Banc.]
Argued September 11, 2001.     Decided February 21, 2002.

THE STATE OF WASHINGTON, *Respondent*, v. HELEN NORMAN, ET AL., *Petitioners*.

SANDERS, J., dissents by separate opinion.

*Jon C. Komorowski* and *Eric M. Weight* (of *Whatcom County Public Defenders Association*) and *Philip J. Buri* (of *Brett & Daugert, P.L.L.C.*), for petitioners.

*David S. McEachran, Prosecuting Attorney*, and *David M. Grant, Deputy*, for respondent.

*Christine O. Gregoire, Attorney General*, and *Jeffrey T. Even, Assistant*, on behalf of the Attorney General's Office, amicus curiae.

MADSEN, J. — The defendants in these consolidated cases maintain that the State lacks jurisdiction to prosecute them for alleged crimes committed north of the 49th parallel, as located by present day geographers and surveyors, but south of the international boundary between the United States and Canada. Our state constitution provides that Washington State's northern boundary in the relevant area is "west along said forty-ninth parallel of north latitude." CONST. art. XXIV, § 1. At the time the United States-Canada border was originally surveyed, prior to Washington's admission into the Union as a state, the surveyors used an astronomic method of locating the 49th parallel that failed to account for local gravitational pulls. For this and other reasons, the international border does not lie on the 49th parallel as currently located.

We hold that this state's northern boundary is coextensive with the international boundary as marked, and accordingly affirm the trial court's denial of the defendants' motion to dismiss for want of subject matter jurisdiction.

## Facts

In 1996, United States Customs officials at border crossings in Whatcom County searched each of the defendants, Helen J. Norman, Kevin C. Belen, and Laura Lee Stradwick. The site of each search is north of the 49th parallel as presently recognized, but south of the United States-Canada border. The searches of Norman and Stradwick led to state charges against them of being in possession of controlled substances, while the search of Belen led to his being charged with possession of stolen property. The defendants' cases were consolidated in Whatcom County Superior Court for purposes of a defense motion to dismiss for lack of subject matter jurisdiction. The defendants argued that the alleged crimes were committed north of the Washington border because they were committed north of the 49th parallel. The trial court held a pretrial hearing on the motion (continuing it as necessary) and considered expert testimony and numerous exhibits pertaining to the location of Washington's border north of Whatcom County. The court denied the motion to dismiss, reasoning that although present day geographers place the 49th parallel at a location different from that of the marked international boundary between the United States and Canada, the political and conceptual location of the international boundary is the 49th parallel and the state constitution defines the state's boundary to follow the international boundary.

The defendants sought discretionary review of the trial court's order and this court granted interlocutory review. We consider the history of the United States-Canada international boundary and the history of Washington's admission into the Union and its boundary in order to decide the issue presented.

The territory west of the Rocky Mountains and north of the 42nd parallel (California's northern border) was jointly occupied by the United States and Great Britain for a period of time prior to 1846, when the conflicting claims

were resolved by The Oregon Treaty[—]Treaty Establishing the Boundary in the Territory on the Northwest Coast of America Lying Westward of the Rocky Mountains (hereafter the Oregon Treaty), *reprinted in* DEP'T OF STATE, INT'L BOUNDARY COMM'N, JOINT REPORT UPON THE SURVEY AND DEMARCATION OF THE BOUNDARY BETWEEN THE UNITED STATES AND CANADA 191-92 (1937) (hereinafter REPORT OF THE COMM'N). The Oregon Treaty provided that the boundary between the two nations "shall be continued westward along the said forty-ninth parallel of north latitude to the middle of the channel which separates the continent from Vancouver's Island." Oregon Treaty, *reprinted in* REPORT OF THE COMM'N at 191. Shortly thereafter, in 1848, Congress created the Oregon Territory, which described the territory as all the United States territory west of the summit of the Rocky Mountains and north of the 42nd parallel. 9 Stat. ch. 177, § 1, at 323 (1848). Then, in 1853, Congress created the Washington Territory from part of the Oregon Territory. Section 1 of the Organic Act described the northern boundary of the new territory when it defined the Washington Territory, in part, as "that portion of Oregon Territory lying and being south of the forty-ninth degree of north latitude." 10 Stat. ch. 90, at 172 (1853). In 1859, the Oregon Enabling Act was passed, setting the northernmost boundary of Oregon along the middle of the Columbia River to the point where it intersects the 46th parallel and then easterly to the Snake River. 11 Stat. ch. 33, § 5, at 384 (1859). The act further provided that the "residue of the Territory of Oregon shall be, and is hereby, incorporated into, and made part of the Territory of Washington." *Id.*

In 1856, Congress enacted legislation for the purpose of carrying out a survey of the border as established by the 1846 Oregon Treaty. Congress directed that the "demarcation of that part of the said line of boundary which forms the boundary line between Washington Territory and the British possessions" be located. 11 Stat. ch. 87, § 4, at 42 (1856). At the time, the Washington Territory extended eastward to the summit of the Rocky Mountains. The

survey was carried out between 1858 and 1862 (though some materials in the record say 1857-61). REPORT OF THE COMM'N at 194-97. The method used is described:

> In the absence of any previous geodetic surveys in the country traversed by this section of the boundary, astronomic observations for latitude had to be made in order to determine the parallel of forty-nine degrees. Such observations were made at selected stations within easily measurable distances of the parallel. The observations were made with great care and a high degree of precision was attained. . . . After the latitude of the station had been determined, a point on the parallel was established by measuring the required distance north or south, as the case might be, from the station to the parallel.
>
> The boundary was then traced along the parallel from the established point by the method of offsets from the tangent to the parallel, the tangent being determined by means of astronomic observations from azimuth.

REPORT OF THE COMM'N at 210-11.

Even at the time, the surveyors recognized that the line marked was not always on the 49th parallel. For example, the English Commissioner reported that survey errors were discovered as great as 860 feet and none less than 180 feet on the boundary between Similkameen and the Kettle River. These errors were discovered when attempts were made to link United States and British points on the boundary, and were resolved by running a "mean parallel." *Id.* at 213 (quoting letter from Comm'r Hawkins dated Apr. 12, 1861). The errors were attributed to "local causes affecting the astronomical observations" and were apparently due to "local station deflection of the plumb line." *Id.* at 213 & n.3 (including footnote in letter). The attribution was apt. As experts for both parties agreed, and as is universally recognized, local land masses can create variations in gravitational pulls, which cause deflections of plumb lines used in astronomical observations to establish lines of latitude.

Another cause was recognized for variation from the astronomic 49th parallel. Once points on the boundary were

marked, the boundary between the marks was agreed to be a straight line. REPORT OF THE COMM'N at 201 (quoting letter from Comm'r Hawkins dated May 7, 1869) (ex. 61). Since a line of latitude by definition is a curved line, this use of connecting straight lines also meant the marked boundary was not truly on the astronomic 49th parallel.

The survey commission prepared a series of seven maps, dated May 7, 1869, showing the location of the original boundary markers. The United States and Great Britain adopted this set of maps in an 1870 declaration stating that

> it appearing that they do *correctly indicate* the said Boundary from the point where the Boundary laid down in Treaties and Conventions prior to June 15th, 1846, terminates *Westward on the 49th Parallel of North Latitude to the Eastern shore of the Gulf of Georgia* [now Boundary Bay], which Boundary has been defined by the Commissioners *by marks upon the ground*;
>
> The Undersigned . . . hereby declare that the said maps . . . are approved, agreed to, and adopted by both Governments.

1870 Declaration,[1] *reprinted in* REPORT OF COMM'N at 197-98 (emphasis added). Thus, despite the known irregularities,[2] in the 1870 Declaration the United States and Great Britain recognized the boundary as marked on the ground as the international boundary along the 49th parallel.

On February 22, 1889, Congress passed the Enabling Act authorizing Washington's entry into the Union as a state. 25 Stat. ch. 180, at 676 (1889). Unlike the cases involving some other enabling acts, ours did not contain a metes and bounds description of the area that would form the new state of Washington. Instead, the Enabling Act said:

---

[1] The full title is "Declaration Approving and Adopting the Maps Prepared by the Joint Commission of the Northwest Boundary for Surveying and Marking the Boundaries Between the British Possessions and the United States Along the 49th Parallel of North Latitude, Under the First Article of the Treaty of 15th June, 1846."

[2] The defendants quote the trial court's memorandum for the proposition that errors in locating the 49th parallel were correctable in 1857. Br. of Pet'rs, at 5-6. The quoted material relates to the 1908 Treaty (discussed below in the text) and maps related to it. *See* Mem. Decision at 6; exs. 3A, 3B, 3C, 3D. It does not relate to 1857 and the original survey.

> [T]he inhabitants of all that part of the area of the United States *now constituting the Territories* of Dakota, Montana, and Washington, *as at present described*, may become the States of North Dakota, South Dakota, Montana, and *Washington*, respectively, as hereinafter provided.

*Id.* § 1 (emphasis added).

The people of the Washington Territory then set about proposing and adopting a state constitution. In 1889, delegates met and drafted a constitution. On July 15, 1889, Committee Chairman Comegys asked for authority for the Committee for Federal Relations, Boundaries and Immigration "to telegraph the Secretary of the Interior for information as to the definite boundaries of the territory of Washington." THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION, 1889, at 96, 848 (Beverly Paulik Rosenow ed., 1999) (hereafter JOURNAL). On August 7, 1889, the committee recommended a boundary description that, in relevant part, described the northern boundary as "thence West along said forty-ninth parallel of north latitude." Ex. 115; JOURNAL at 276.[3] The convention passed the committee's recommended description of the state boundary, with minor changes not relevant here, on August 19, 1889. Ex. 115. The voters ratified the state constitution. The boundary as adopted (and as subsequently modified by

---

[3] The analytical index to THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION, 1889, at 848 (Beverly Paulik Rosenow ed., 1999), states that in the original version of the boundary description the northern border was described as along said "parallel of north latitude to the middle of the channel which separates Vancouver's island from the continent." The defendants say that at page 276 of an earlier edition (B. Rosenow ed., 1962), the boundary committee recommended this language as part of the state's boundary description. However, the portion of the 1999 edition where the journal itself is contained quotes the language recommended by the committee as being the same as stated in the text of this opinion. JOURNAL at 276. This language appears correct. Exhibit 115 is a document printed by T.H. Cavanaugh, Public Printer, containing the committee's recommendation, in the language quoted in the text, and marked by a handwritten notation "as passed Aug 19th" and signed by the Chief Clerk. It appears the *Journal* language itself was corrected in the 1999 version of the *Journal*. The reason for the difference in language in the analytical index of the 1999 version of the *Journal* is not apparent.

the 33rd Amendment[4]) is found in article XXIV, section 1 of our state constitution.

On November 11, 1889, President Benjamin Harrison issued a proclamation admitting Washington into the Union as a state. 26 Stat. Proclamations at 10 (Nov. 11, 1889).

In 1908, the United States and Great Britain entered another treaty concerning the international border. The 1908 treaty consists of separate articles. An introductory section states the desire of the nations for a "more complete definition and demarcation of the international boundary between the United States and the Dominion of Canada." Introduction, Treaty Between the United States of America and the United Kingdom Concerning the Boundary Between the United States and the Dominion of Canada from the Atlantic Ocean to the Pacific Ocean, April 11, 1908 (hereafter 1908 Treaty), *reprinted in* REPORT OF THE COMM'N at 1. Article VII addresses the boundary from the summit of the Rocky Mountains to the Gulf of Georgia, now Boundary Bay. It provides in part:

> Whereas, by concurrent action of the Government of the United States and the Government of Great Britain in 1902 and 1903, Commissioners were designated to act jointly for the purpose of renewing lost or damaged monuments and placing additional monuments where such were needed throughout the course of *the boundary along the forty-ninth parallel of north latitude*, from the summit of the Rocky Mountains westward to the eastern shore of the Gulf of Georgia, *as defined in Article I of the Treaty of June 15, 1846, between the United States and Great Britain* [the Oregon Treaty] and *as marked by monuments along its course* and laid down on a series of charts, seven in number, by a Joint Commission organized in 1858 for that purpose and composed of two Commissioners appointed one by each Government, which charts . . . *were approved and adopted by the two Governments*, as appears from the declaration in writing . . . [of] February 24, 1870 [the 1870 Declara-

---

[4] Amendment 33, 1957, added language to article XXIV, section 1 allowing state boundaries to be modified by appropriate interstate compacts approved by Congress.

tion], . . . and it appearing that the remonumenting of *this line* by the Commissioners first above referred to is now approaching completion;

[The parties agree that when the work is complete the "entire course of said boundary" shall be marked on charts and a report made of the work done];

The line so laid down and defined shall be *taken and deemed to be the international boundary as defined and established by treaty provisions and the proceedings thereunder as aforesaid . . . .*

1908 Treaty, *reprinted in* REPORT OF THE COMM'N at 8 (emphasis added).

Each of the articles in the 1908 Treaty relating to a section of the border ends similarly to Article VII, i.e., each states the line so laid down shall be taken and deemed to be the international boundary as defined and established by previous treaties.

In addition to the historical events summarized above, the parties presented expert testimony at the pretrial hearing on the question of Washington's northern boundary. The State's witnesses generally described the difference between location of the 49th parallel using astronomical observations and geodetic datums. The latter methodology, briefly stated and simplified, involves starting from a point believed to cause little or no deflection due to gravitational effect (because, for example, it is on a plain), locating that point, and then, using triangulation, creating a scheme of connected points used to locate degrees of latitude and longitude. Aside from the possibility that the initial point may have some deflection, the remaining points will be free of the effects of gravitational variance on the earth. More recently, global positioning systems have been used in surveying.

Additional testimony is discussed below where relevant to the analysis.

In 1996, the parties commissioned a firm to survey the location of the three Customs inspection facilities where the defendants were searched. The firm used global positioning and geodetic surveying methodology to locate the 49th

parallel near the sites. The results of the survey were that each of the sites was north of the discovered 49th parallel.

The trial court issued a memorandum decision explaining its denial of the defendants' motion to dismiss for want of subject matter jurisdiction. The court found no dispute that the international boundary as marked on the ground differs from the 49th parallel as currently determined. The court rejected the defendants' arguments that the 1908 Treaty altered the border definition in fact and concept, noting that the 1908 Treaty consistently refers to prior treaties, specifically, in relevant part, the 1846 Oregon Treaty, and nowhere indicates that the 1846 treaty is superseded. The court concluded that the international border continues to be conceptually and politically defined by the United States and Great Britain as the 49th parallel. The court discussed the various surveying methods, but found that the 1846 and 1908 Treaties, which the court described as political actions in nature, affirmed the boundary as the 49th parallel despite known anomalies in the original survey and the development of geodetic systems by the time of the remonumenting in the early 1900s. The court then reasoned that the intent of the drafters of the Washington State Constitution was to follow the language contained in the 1846 Treaty of Oregon defining the international boundary as the 49th parallel, and to define Washington's boundary in the same way.

## Analysis

The defendants argue the State lacks jurisdiction to prosecute them for alleged crimes committed north of the 49th parallel as currently determined and south of the international boundary. They also maintain that prosecution violates their rights under the Sixth Amendment to the United States Constitution, which states that a defendant has a right to trial by a jury "of the state and district wherein the crime shall have been committed."

■■■ RCW 9A.04.030 defines state criminal jurisdiction and, in relevant part, states that there is jurisdiction when

"[a] person . . . commits in the state any crime, in whole or in part." RCW 9A.04.030(1). "Proof of jurisdiction beyond a reasonable doubt is an integral component of the State's burden in every criminal prosecution." *State v. Squally*, 132 Wn.2d 333, 340, 937 P.2d 1069 (1997) (citing *State v. Svenson*, 104 Wn.2d 533, 542, 707 P.2d 120 (1985)). Generally, proof that the crime was committed in the state satisfies the jurisdictional element. *Id.* The question of jurisdiction is a question of law, which the court reviews de novo. *Id.*

The question whether the defendants' alleged crimes were committed in the state depends upon delineation of the state boundary. Article XXIV, section 1 of the Washington State Constitution states in relevant part that the northern boundary of the state is "west along said forty-ninth parallel of north latitude." A question of constitutional construction is a question of law reviewed de novo by the court. *City of Kennewick v. Benton County*, 131 Wn.2d 768, 771, 935 P.2d 606 (1997); *State ex rel. Humiston v. Meyers*, 61 Wn.2d 772, 777, 380 P.2d 735 (1963); *Mount Spokane Skiing Corp. v. Spokane County*, 86 Wn. App. 165, 172, 936 P.2d 1148 (1997).

The State maintains that the language in the state constitution must accord with congressional intent in enacting the Enabling Act and admitting Washington State into the Union, and therefore the issue is one of determining that intent. We agree.

The particular question here, the location of a state boundary, is ultimately a question of congressional intent. United States Constitution article IV, section 3, gives Congress the power to create new states and to establish the boundaries of the states. *Texas v. Louisiana*, 410 U.S. 702, 707, 93 S. Ct. 1215, 35 L. Ed. 2d 646 (1973). The United States Supreme Court has thus said that its task in resolving state boundary disputes is "to ascertain congressional will when it admitted" a state into the Union. *Id.*; *see also Illinois v. Kentucky*, 500 U.S. 380, 387, 111 S. Ct. 1877, 114 L. Ed. 2d 420 (1991); *Washington v. Oregon*, 211 U.S.

127, 134-35, 29 S. Ct. 47, 53 L. Ed. 118 (1908); *Louisiana v. Mississippi*, 202 U.S. 1, 46-47, 26 S. Ct. 408, 50 L. Ed. 913 (1906). Thus, when the Court decides boundary disputes between states,[5] or between the United States and a state, it examines the enabling acts of the states as part of the inquiry into what the boundaries of the states were intended to be. *E.g., Texas*, 410 U.S. 702; *United States v. Wyoming*, 331 U.S. 440, 67 S. Ct. 1319, 91 L. Ed. 1590 (1947); *Minnesota v. Wisconsin*, 252 U.S. 273, 40 S. Ct. 313, 64 L. Ed. 558 (1920). The Court also examines relevant treaties and conventions and related enactments. *E.g., Vermont v. New Hampshire*, 289 U.S. 593, 53 S. Ct. 708, 77 L. Ed. 1392 (1933); *United States v. Texas*, 162 U.S. 1, 16 S. Ct. 725, 40 L. Ed. 867 (1896); *Missouri v. Kentucky*, 78 U.S. (11 Wall.) 395, 20 L. Ed. 116 (1870); *Missouri v. Iowa*, 48 U.S. (7 How.) 660, 12 L. Ed. 861 (1849).

Our Enabling Act states that the "inhabitants of all that part of the area of the United States *now constituting the Territor[y]* of . . . Washington, *as at present described*, may become the State[] of . . . Washington . . . as hereinafter provided." 25 Stat. ch. 180, at 676 (1889) (emphasis added). Congress thus invited Washington to become a state with the same boundaries it had as a territory.

The then present description of the Washington Territory included (1) the Oregon Treaty, which provided that the boundary between the United States and the British possessions "shall be continued westward along the said forty-ninth parallel of north latitude to the middle of the channel which separates the continent from Vancouver's Island," Oregon Treaty, *reprinted in* REPORT OF THE COMM'N at 191; (2) the 1848 congressional enactment creating the Oregon Territory, which described the territory as all the United States territory west of the summit of the Rocky Mountains and north of the 42nd parallel, 9 Stat. ch. 177, § 1, at 323 (1848) (ex. 55), thus necessarily including the land south of the 49th parallel; (3) the description of the Organic Act of

---

[5] The United States Supreme Court has original and exclusive jurisdiction of all controversies between two or more states. 28 U.S.C. § 1251 (1994).

1853 creating the Washington Territory and describing the northern border in relevant part as "that portion of Oregon Territory lying and being south of the forty-ninth degree of north latitude," 10 Stat. ch. 90, at 172 (1853); (4) the 1859 Oregon Enabling Act which directed that until further Congressional action, the "residue of the Territory of Oregon shall be . . . a part of the Territory of Washington," 11 Stat. ch. 33, at 384 (1859); and (5) an 1863 act forming the Idaho Territory from the eastern part of the Washington Territory, 12 Stat. ch. 177, at 808 (1863) (*see* ex. 141, at 245).

Thus, at the time the Enabling Act was passed in 1889, the description of the northern border of the Washington Territory "as at present described" was, in relevant part, the 49th parallel, the same 49th parallel that constituted the international boundary. Indeed, the 1856 legislation enacted for the purpose of carrying out the survey of the international border as established by the 1846 Oregon Treaty directed location of the "demarcation of that part of the said line of boundary which forms the boundary line *between Washington Territory and the British possessions.*" 11 Stat. ch. 87, at 42 (1856) (emphasis added).

However, Congress did not intend a true geographic boundary on the 49th parallel. At the time the Enabling Act was passed, both the United States and Great Britain continued to deem the international boundary to be on the 49th parallel as located in the survey conducted to carry out the 1846 Oregon Treaty, despite known anomalies. This is clear from the 1870 Declaration that recognized the resulting boundary marked on the ground as the international boundary on *"the 49th Parallel of North Latitude."* 1870 Declaration, *quoted in* REPORT OF THE COMM'N at 197-98 (emphasis added).

Thus, Washington's admission as a state with a northern boundary along the 49th parallel effectuated congressional intent that the new state have as its northern boundary the

49th parallel, the same as it had as a territory, which was the same boundary line as the international boundary.[6]

The defendants maintain, however, that the meaning of a provision in our state constitution, including the boundary definition, is a question of the intent of the framers of the state constitution. They then rely on cases standing for the principle that if the language of the constitution is plain and unambiguous, it reflects the framers' intent and is not subject to judicial interpretation. *E.g., State ex rel. Anderson v. Chapman*, 86 Wn.2d 189, 191, 543 P.2d 229 (1975); *State ex rel. O'Connell v. Slavin*, 75 Wn.2d 554, 557, 452 P.2d 943 (1969); *State ex rel. O'Connell v. Port of Seattle*, 65 Wn.2d 801, 805, 806, 399 P.2d 623 (1965). Defendants argue that the plain language of the constitution unambiguously defines a geographic boundary.[7]

This court has previously emphasized the importance of determining congressional intent where a provision in the state constitution is mandated by the Enabling Act:

> In order to determine the meaning of the enabling act and our constitutional provisions, *it is necessary to ascertain the intent* of the framers of our constitution and that *of Congress,* first, *in passing the enabling act,* in the preparation of the constitution, *and the acceptance of the state into the Union.* That intent must be based upon the intent of the instruments considered as a whole.

> The constitution must be construed in the sense in which the framers understood it in 1889.

---

[6] The defendants urge, however, that the circumstances of Idaho's admission as a state show that Congress recognized that the "49th parallel" was not coextensive with the international boundary between the United States and the British possessions. When Idaho was admitted into the Union by an act of Congress, Congress changed the northern boundary description of the state from the "49th parallel" to "the boundary line between the United States and the British Possessions." 51st Cong. sess. 1, ch. 656 (1890). The reason for the change is not apparent. While the defendants say it shows a difference in congressional intent, we are not persuaded. First, if the two were coextensive, the two descriptions may simply have meant the same thing. More importantly, the enactment regarding Idaho's border does not alter our analysis regarding Washington's border in light of clear congressional intent as to our own northern boundary.

[7] The State says, however, that even under a plain meaning rule, the term 49th parallel is subject to judicial construction. As the State points out, there are at least seven different systems for locating the 49th parallel. This creates a latent ambiguity in the term used in article XXIV, section 1.

*Boeing Aircraft Co. v. Reconstruction Fin. Corp.*, 25 Wn.2d 652, 658, 171 P.2d 838 (1946) (emphasis added) (citation omitted). *Boeing* concerned a provision in the state constitution, mandated by the Enabling Act, that the state would not tax real property of the United States without its consent. Here, congressional intent plays an even greater role in light of United States Constitution article IV, section 3. Accordingly, we must consider more than the language used in article XXIV, section 1 of our state constitution.

Defendants say, however, that the United States Supreme Court also applies a "plain meaning" approach to boundary determinations. They rely on *New Jersey v. New York*, 523 U.S. 767, 782-84, 118 S. Ct. 1726, 140 L. Ed. 2d 993 (1998). However, the argument raised there was whether an 1834 compact between New York and New Jersey providing that New York would retain jurisdiction over Ellis Island meant that additions to the land created by fill were also within New York's jurisdiction. Here, we are faced with the Enabling Act and our state constitutional provision, not a boundary compact between two states that has been approved by Congress. The Court stated in *Central Railroad Co. of New Jersey v. Jersey City*, 209 U.S. 473, 477, 476, 28 S. Ct. 592, 52 L. Ed. 896 (1908), when construing the same compact at issue in *New Jersey*, 523 U.S. 767, that "[t]he decision depends upon the construction of an agreement made between New Jersey and New York." In contrast, where questions of state boundaries have arisen in other contexts, the Court has, as we do here, examined enabling acts, and relevant treaties and congressional enactments to determine congressional intent when admitting a state into the Union.

██ Central to defendants' plain language argument is their contention that the Enabling Act was an offer of statehood to which the framers of our state constitution made a counteroffer. They urge that the Enabling Act gave specific mandatory requirements for certain aspects of the state constitution, including religious freedom, matters concerning public and Indian lands, debts and liabilities of

the Territory, and public schools. In contrast, the act did not contain a metes and bounds description for Washington, as some other enabling acts do, and as ours does for the states of North and South Dakota. Further, they say, the phrase "as at present described" in the act is ambiguous because it does not say which description was to be used. The absence of a detailed boundary description and the use of ambiguous language, they urge, meant that this matter was left to the state. Then, the defendants reason, when the state was admitted to the Union by presidential proclamation, the federal government accepted the state's boundary written into the constitution as the true 49th parallel, not the international boundary. Thus, Washington's constitution with its inclusion of the "49th parallel" in its northern boundary description was a counteroffer that was accepted by presidential proclamation.

Defendants cite no authority for the proposition that the state had the power to make a counteroffer regarding its boundaries.[8] The Enabling Act did not grant such authority, contrary to defendants' argument. That act delegated to the President the duty, provided that all the provisions of the Enabling Act were complied with, to announce the proposed state's compliance with the act and to issue a proclamation announcing the results of the election in the state, "and thereupon the proposed State[] . . . shall be deemed admitted by Congress." 25 Stat. ch. 180, § 8 at 679 (1889). The act clearly contemplated that the state conform its constitution to the boundary description stated in the act, i.e., the same boundary as the Washington Territory had.[9]

Nor was there any reason for Congress (or the President) to think that Washington's constitution was a counteroffer

[8] There is also a question pertaining to Congress' authority to delegate to the President power to entertain a counteroffer.

[9] This court has said that, when first enacted, the Enabling Act was "no more than a proposition or offer of a contract," but once the state accepted the terms of the Enabling Act by adopting a constitution and the state was admitted by Presidential proclamation, both the United States and Washington were "bound by the provisions of that enabling act." *Boeing Aircraft Co. v. Reconstruction Fin. Corp.*, 25 Wn.2d 652, 658, 171 P.2d 838 (1946).

with a boundary different from that of the Washington Territory as described at the time of the Enabling Act, i.e., the 49th parallel as coextensive with the international boundary. The federal position at the time was that the international boundary and the Washington Territory boundary were both considered to be on the 49th parallel.

It is clear, in any event, that there was no attempt to make a counteroffer. An examination of relevant history and circumstances shows that the framers' intent was the same as that of Congress.

As the defendants note, in 1878 delegates to what is known as the Walla Walla Convention drafted a state constitution.[10] Delegate Edward Eldridge was appointed to a committee which addressed boundaries. *Washington's First Constitution, 1878, and Proceedings of the Convention, reprinted in* THE WASHINGTON HISTORICAL QUARTERLY, 1915-1919 at 10. The convention adopted a definition of the northern border stating in part "thence, westerly *along the line of the British Possessions.*" *Id.* at 63 (emphasis added). On August 10, 1889, Mr. Eldridge, who was also a delegate to the 1889 convention, "moved to substitute the description in the [1878] Walla Walla Constitution." JOURNAL at 334. The motion was "[l]ost." *Id.*

Defendants contend that this shows that the constitutional convention in 1889 deliberately rejected language which would have placed the state's northern boundary at the international boundary, and instead opted for a different boundary, the 49th parallel. They reason that the delegates' decision shows that the international boundary and the 49th parallel were not considered to be synonymous at the time.

There is a more plausible reason for the delegates' choice of language, however. As noted, Mr. Comegys, the chairman of the committee dealing with boundaries, asked for and received permission to telegraph the Secretary of the Inte-

---

[10] The voters ratified this constitution, which was drafted without prior federal enabling legislation, but the state was not admitted into the Union at that time. JOURNAL, Foreword at iii.

rior for a description of the Washington Territory. Given that the state Enabling Act stated that the Washington Territory "as at present described" was invited to become a state, the convention's choice of language is not surprising. It chose the same language that then described the territory's northern boundary and the international boundary, i.e., the 49th parallel.

By choosing the same language that Congress had used in enactments and treaties pertaining to the international border and Washington Territory's northern border, the delegates expressed the same intent as Congress had.

The defendants also say that the understanding of our state constitution's framers that the 49th parallel and the international boundary were not the same is shown by the fact that the boundary description in the state constitution uses both the 49th parallel as part of the northern boundary, and also uses "the boundary line between the United States and British possessions" to describe the northern boundary of Washington through the waters between Canada and the United States. WASH. CONST. art. XXIV, § 1. The boundary through the waters could not have been described as the 49th parallel, however, since it falls nowhere near the 49th parallel by any definition.

The defendants maintain that at the time the Washington constitution was drafted it was known that the international boundary did not lie on the true 49th parallel.[11] They impute this knowledge to the framers, and reason

[11] Defense witness Dr. John Bossler, Director of the Coast and Geodetic Survey from 1983 to 1986, and Director of the National Geodetic Survey from 1980-83, among other things, testified that in 1889 when Washington became a state there was knowledge that there was a difference between the 49th parallel and the international boundary. He said "[s]omewhere around 1800 triangulation became the way in which geodetic computations of positioning was performed." Verbatim Report of Proceedings (RP) at 209. He testified that local datums have been used in this country since it was created. He testified that between 1889 and 1901, when retracement of the international boundary commenced (culminating in the 1908 Treaty and further work done pursuant to that treaty), there were no advances in scientific knowledge regarding geodetic sciences. He testified that a specific hydrographic survey of the Straits of Rosario and De Haro made by the United States Coast Survey in 1858 showed that at least a local network of triangulation had been used to locate positions on the map. *See* Ex. 136. Similarly, he concluded, another hydrographic survey showed use of triangulation for

that it follows that the use of the term "49th parallel" meant something other than the international boundary.

The evidence is to the contrary. The expert testimony indicated that, while knowledge of geodetic methods may have existed, locating the international boundary by a geodetic method did not occur until after Washington became a state. Even once that had occurred, the United States and Great Britain still considered the international boundary to be along the 49th parallel as located in the 1858-62 astronomic survey.

We are not convinced that the framers had a scientific 49th parallel in mind when drafting the constitution. The weight of the evidence shows that they intentionally used the same language as Congress used in treaties and enactments relating to the Washington Territory's boundary in order to conform to the mandate in the Enabling Act that the new state have the same boundary as the territory had. Given the numerous maps in the record showing coextensive international and territorial boundaries on the same line—the 49th parallel—we are also not convinced that the voters of the territory thought they were adopting in the constitution a boundary other than one coextensive with the international boundary.

Finally, the defendants say that Washington's failure to modify its language when the federal government did so shows intent that the state boundary is not the same as the international boundary. This seems to be a reference to the argument pursued by the defendants at the pretrial hear-

---

Semiahmoo Bay. *See* Ex. 135. Dr. Bossler also testified extensively about an 1865 Department of the Interior Map of public surveys in Washington Territory that he says clearly shows the difference between the astronomic and the geodetic parallels. *See* Ex. 100.

Dr. Chrisman, a professor of geography at the University of Washington, also testified for the defense. He testified that the deviation shown on the 1865 Department of the Interior map was exaggerated to show, but did show, that the international boundary was not in the same place as the 49th parallel, and explained the deviation was shown only on the western part of the boundary because that is all that was known about at the time. *See* Ex. 100. He also testified that exhibits 135 and 136 showed use of local triangulation. Generally, he summarized his testimony as showing "the development in accuracy that is going on through this period from the 1850's through 1908 and onward." RP at 358.

ing, and rejected by the trial court, that in entering the 1908 Treaty, the United States switched from defining the international boundary as the 49th parallel to defining it as the physical boundary on the ground.

■ The 1908 Treaty did not define a new international boundary nor did it change the definition of the existing boundary. It specifically references both the Oregon Treaty of 1846 defining the international boundary as the 49th parallel and the 1870 Declaration approving the maps resulting from the survey conducted to carry out that treaty as defining the international boundary along the 49th parallel. Article VII of the 1908 Treaty concludes with: "The line so laid down and defined shall be *taken and deemed to be the international boundary as defined and established by treaty provisions and proceedings thereunder as aforesaid."* 1908 Treaty, *reprinted in* REPORT OF THE COMM'N at 8 (emphasis added). The United States and Great Britain clearly adhered to the astronomically based 49th parallel as the international boundary even though it was apparent by 1908 that a geodetic survey would place the boundary in a different location.

## Conclusion

At first blush the language "west along said forty-ninth parallel of north latitude" in article XXIV, section 1 appears to refer to the 49th parallel as marked on current maps and as we currently understand it. However, our Enabling Act, treaties and enactments relating to the international border, and the admission of Washington as a state indicate that Congress intended Washington's borders to be the same as those of the Washington Territory; that the Washington Territory's border was the same as the international boundary between the United States and the British possessions to the north; and that the international boundary lay along the 49th parallel as determined in the astronomic survey conducted to carry out the 1846 Treaty of Oregon. The political and conceptual location of the international

and state borders was the same when Washington was admitted as a state, and remains so. Legally, the two boundaries are coextensive.

Affirmed.

ALEXANDER, C.J., and SMITH, JOHNSON, IRELAND, BRIDGE, CHAMBERS, and OWENS, JJ., concur.

SANDERS, J. (dissenting) — This case raises basic yet simple jurisdictional questions of "what" and "where." *What* is the northern border of our state? *Where*, in relation to that border, did these crimes take place?

The former question is of law, not fact. The answer might be found in the language of our state constitution or the relevant federal law which preceded it. The latter question is of fact, but that fact is undisputed here. As the majority states, all crimes occurred north of the 49th parallel. Majority at 581.

## I

### *"Forty-Ninth Parallel" Means Forty-Ninth Parallel*

A. State Constitution

"Appropriate constitutional analysis begins with the text and, for most purposes, should end there as well." *Malyon v. Pierce County*, 131 Wn.2d 779, 799, 935 P.2d 1272 (1997). Judicial interpretation of constitutions is unnecessary and improper when the constitutional language is facially unambiguous. *State ex rel. O'Connell v. Port of Seattle*, 65 Wn.2d 801, 806, 399 P.2d 623 (1965). "It is a cardinal principle of judicial review and interpretation that unambiguous . . . constitutional provisions are not subject to interpretation and construction." *State ex rel. Evans v. Bhd. of Friends*, 41 Wn.2d 133, 145-46, 247 P.2d 787 (1952); *see also State ex rel. Wash. Nav. Co. v. Pierce County*, 184 Wash. 414, 422-23, 51 P.2d 407 (1935) (stating even though desired constitutional interpretation tended to serve good

public purpose and benefit, construction will not be adopted when contrary to clear language used by framers).

The relevant language of our state constitution is clear and unambiguous. It plainly identifies the relevant portion of our northern boundary as "west along said forty-ninth parallel of north latitude." WASH. CONST. art. XXIV, § 1. That answers the state constitutional law inquiry: our northern boundary is the 49th parallel.

B. Federal Law

After detailing the pertinent pre-1889 federal and territorial history, the majority also arrives at the correct legal conclusion that "at the time the Enabling Act was passed in 1889, the description of the northern border of the Washington Territory . . . was, in relevant part, the 49th parallel." Majority at 591. This is correct because the Enabling Act, the federal law authorizing Washington's statehood, identified the relevant northern border of our state by expressly referring to the Washington Territory border "as at present described." 25 Stat. ch. 180, at 676 (1889). The Organic Act, the federal law establishing Washington Territory, defined the northern border of Washington Territory as "the forty-ninth degree of north latitude." 10 Stat. ch. 90, at 172 (1853). Therefore, the pertinent federal law which preceded our state constitution leads us to the same conclusion—the 49th parallel.

C. Scientific and Constitutional History

Instead of concluding the 49th parallel means the 49th parallel, the majority opines it means the "international border." Majority at 591. The majority is still "not convinced that the framers had a scientific 49th parallel in mind when drafting the constitution." *Id.* at 597. Unlike the majority, I claim no ability to read minds, only the written word. If the 49th parallel has meaning, our job is simply to determine it. I think it does have meaning, a very precise meaning, and a meaning constant over the millennia.

Aided by astronomical observations, Greek astronomer Hipparchus of Nicaea, in the second century B.C., fully

developed a system of parallel lines around a spherical earth at equal intervals from the equator to the two poles. *See* DANIEL J. BOORSTIN, THE DISCOVERERS 97 (1995). "By using celestial phenomena common to the whole earth to locate places on the earth's surface, he set the pattern for man's cartographic mastery of this planet." *Id.* Hipparchus divided the earth into 360 sections, roughly 70 miles apart, which later came to be known as "degrees." *Id.*

Ptolemy, however, is credited for first mapping the world. Ptolemy, in his *Geography*, drew on the work of Hipparchus and others, and in fact "may actually have invented[] the expressions for latitude and longitude." *Id.* at 98. Like Hipparchus, he too divided the world into 360 degrees but with additional subdivisions of minutes and seconds. *Id.*[12]

By 1889 the terms "latitude" and "parallel" were used commonly and exclusively with reference to this precise mathematical meaning. A mid-19th century dictionary designed "for ready reference and general use" defined latitude as "the distance of a place from the equator, expressed in degrees of the earth's circumference." A DICTIONARY OF SCIENCE, LITERATURE, AND ART 644 (W.T. Brande ed., 1853). "Parallels of latitude" meant "small circles parallel to the equator." *Id.* at 892. In a geography textbook of the same time, latitude is defined as the:

> distance north or south from the equator, and is reckoned in degrees, on a meridian, towards the poles; hence the highest latitude is that of 90°, or one-fourth of the earth's circumference. The mean length of a degree of latitude in English miles is 69.05 miles. A degree of any great circle of the earth is commonly reckoned as equal to 69¼ miles.

CORNELIUS S. CARTÉE, ELEMENTS OF PHYSICAL AND POLITICAL GEOGRAPHY 43-44 (1855). Even an *abridged* dictionary for use in common schools defined latitude as a "distance north

---

[12] *Measuring* latitude also has a long history. The Ancient Greeks figured out latitudes by observing circumpolar stars. BOORSTIN, *supra*, at 48. By medieval times, sailors used cross-staffs to determine the declination of the sun above the horizon and then compared those measurements with astronomic tables in nautical manuals. *Id.* By approximately the mid-14th century, one could fix a latitude "to within half a degree or less." *Id.*

or south from the equator." JOSEPH E. WORCESTER, AN ELEMENTARY DICTIONARY OF THE ENGLISH LANGUAGE 169 (1860).

Therefore, contrary to the majority opinion, it appears by 1889 the terms "latitude" and "parallel" conveyed a precise mathematical construct, even in common parlance. *See also* Robert F. Utter, *Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights*, 7 U. PUGET SOUND L. REV. 491, 509 (1984) (advocating a textual analysis of the state constitution giving the words used their common and ordinary meaning in 1889); *Bloomer v. Todd*, 3 Wash. Terr. 599, 615, 19 P. 135 (1888) (explaining how "[t]he ordinary use of words at the time when used, and the meaning adopted at that time, is usually the best guide for ascertaining . . . the intent of any written instrument or law at the time it was made that is to govern in enforcing it.").

Of course, one may be mistaken when attempting to locate the 49th parallel on the ground just as a small child may mistake the sum of one and one.[13] But that does not render the term ambiguous in the least; it tests only our skills to find it.

Not that it matters, but it may be of interest that historical evidence proves our founding generation, even by the mid-19th century, knew the 49th parallel was not the same as what had been marked on the ground as the international boundary between the United States and what is now Canada. As the trial court found and the majority also acknowledges, it was then understood as a matter of fact the 49th parallel did not equate to the physical markings on the land. Clerk's Papers (CP) at 51; majority at 583. As a result, Washington's proposed 1878 constitution referred to the international border, not the 49th parallel, to define our state's northern border. *See* WASH. CONST. art. I (1878), *reprinted in* 10 WASH. HIST. Q. 59 (1919). However, while this same language was proposed to

---

[13] I am aware of only a single exception to this rule: When I asked five-year-old Brien Galbraith, "how much is one and one," he (correctly) answered "eleven." Even there, however, the problem was with the question, not the answer.

be used in our now operative 1889 constitution, it was purposefully rejected, the convention opting for the 49th parallel text instead. *See* THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION, 1889, at 334, 849 (Beverly Paulik Rosenow ed., 1999).

Accordingly, even if we looked behind the meaning of the words used to see if our framers *really* meant what they said, the people of Washington adopted the scientific, and commonly understood, language of "forty-ninth parallel" purposefully, specifically rejecting alternative proposed language referencing the international border.

" 'A cardinal rule in dealing with constitutions is that they should receive a consistent and uniform interpretation, so that they shall not be taken to mean one thing at one time and another thing at another time, even though the circumstances may have so changed . . . .' " *State ex rel. Munro v. Todd*, 69 Wn.2d 209, 214, 417 P.2d 955, 426 P.2d 978 (1966) (quoting *State ex rel. Banker v. Clausen*, 142 Wash. 450, 454, 253 P. 805 (1927)).

As noted in an 1855 "physical and political geography" textbook:

> The seas, mountains, rivers, and coasts possess the same prominent features at the present day as in the times of Caesar, of Solomon, or of Abraham; while the boundaries and extent of nations have been subject to frequent fluctuations, and human society is ever marked by change and revolution.

CARTÉE, *supra*, at 217. Consider a hypothetical: Suppose the United States by force of arms liberated British Columbia from Canadian rule. If our state's northern boundary were defined simply as whatever the international boundary might be, British Columbia would then seem to automatically become part of the State of Washington. Would this *new* international boundary then be the *new* "forty-ninth parallel?"

## II

### *"Latent" Ambiguity?*

The majority attempts to bypass the words of our constitution claiming in a footnote that the 49th parallel as used in article XXIV, section 1 has a "latent ambiguity." Majority at 592 n.7. I gather this alleged "latent ambiguity" is meant to identify words clear on their face but somehow unacceptable to the majority in meaning. The majority does not provide citation to any authority, nor does it make any argument whatsoever, that a "latent ambiguity" is an appropriate vehicle to circumvent clear constitutional text. In fact, we have never used this inventive term with reference to application of a fundamental constitutional principle.

By definition "[a] latent ambiguity is one that is not apparent upon the face of the instrument alone [i.e., a patent ambiguity] but which becomes apparent when applying the instrument to the facts as they exist." *In re Estate of Bergau*, 103 Wn.2d 431, 436, 693 P.2d 703 (1985) (citing *Carney v. Johnson*, 70 Wn.2d 193, 422 P.2d 486 (1967); *Vadman v. Am. Cancer Soc'y*, 26 Wn. App. 697, 615 P.2d 500 (1980); 4 William J. Bowe & Douglas H. Parker, Page on the Law of Wills § 32.7 (rev. ed. 1960) (wills interpretation context)); *see also Brown v. City of Bremerton*, 69 Wash. 474, 476-77, 125 P. 785 (1912) (deed interpretation context).

For example, what if my will devised "my Jaguar sports car to my law clerk"?[14] While unambiguous on its face, the language would be latently ambiguous since I have two law clerks. *See also Vadman*, 26 Wn. App. at 699-700; Mark Reutlinger, Wills, Trusts, and Estates 89-90 (2d ed. 1998). Although my testamentary intent would appear clear by simply reading the instrument itself, it nevertheless would become unclear in application which beneficiary really was

---

[14] This example serves as further proof of law clerk influence on the opinion drafting process.

intended once the instrument was applied. *See also Vadman*, 26 Wn. App. at 699-700; REUTLINGER, *supra*, at 89.

Assuming we can properly extrapolate these rules to constitutional interpretation,[15] the "forty-ninth parallel" is not "latently" ambiguous in any event. This is because, unlike the example above, no hidden confusion is revealed when applying the "forty-ninth parallel" in the context of this case. It is a precise mathematical construct with but a single meaning and universal application. Moreover, it remains undisputed the crimes occurred above the 49th parallel.[16]

There also remains a sense of irony in the majority's introduction of this supposed latent ambiguity. The fact the majority feels compelled to modify "ambiguity" with the adjective "latent" only proves its belief the term "forty-ninth parallel" *on its face* is unambiguous. Why else call the ambiguity "latent"? I think the majority has other motives: why recognize a no man's land, even if one truly exists? But the truth is out there, whether the majority chooses to credit it or not: *Fiat justitia et ruant coeli.*[17]

## III

### A Category Mistake of Galactic Magnitude

The majority's attempt to find ambiguity (patent or latent) in the term "forty-ninth parallel" is premised on the State's argument "there are at least seven different systems for locating the 49th parallel." Majority at 592 n.7. In attempting this argument, however, the majority commits what is known as a "category mistake."

---

[15] Again, I find no such authority to do so.

[16] Even if one believes "forty-ninth parallel" somehow is latently ambiguous and therefore a resort to extrinsic evidence is warranted, considering sources other than the words the framers expressly used only corroborates they *really meant* the 49th parallel to be our northern border. *See supra* Part I.C.

[17] Let justice be done, though the heavens fall.

English analytical philosopher Gilbert Ryle introduced the phrase "category mistake" in the mid-20th century to describe a confusion in the attribution of properties or the classification of things. GILBERT RYLE, THE CONCEPT OF MIND 15-22 (1949). As used in legal writing, the category mistake has been described as "an inappropriate linking of disparate concepts spawned by grammatical similarities in representation." Joel R. Cornwell, *Legal Writing as a Kind of Philosophy*, 48 MERCER L. REV. 1091, 1117 (1997). Unfortunately, it is "the lawyer's treasured trope." *Id.*

The majority makes a category mistake of galactic magnitude when it attributes ambiguity to "forty-ninth parallel" by reference to differing methods of determining where the 49th parallel lies on the ground. Properly understood, "the what" and "the where" are different. On the one hand, there exists the category of the things themselves, i.e., the latitudes or parallels of which the 49th obviously is a member. On the other hand, there exists the category of systems to measure where those things might be, i.e., the tools we use to locate latitudes or parallels.

These two categories, however grammatically similar they may be, are distinct and should not be conflated. While we may use differing empirical procedures to ascertain the location of latitudes, some giving more precise results than others, those systems of measurement do not create ambiguity in the meaning of the term "forty-ninth parallel" anymore than a child's mistake in performing addition renders the erroneous sum of one plus one "ambiguous."

## IV

### Conclusion

This case is easier than pi. The 49th parallel can be located to the decimal. It is precise as logic. It is as pointed as the needle on a compass. If that term is ambiguous, the language of law is no more than sand shaped into castles at the arbitrary whim of he (or she) who wears the black gown.

I fear the majority begins with the result it seeks to impose rather than reasoning from sound legal principles, known facts, and precise mathematical formulae to find a result. The memorandum decision of the trial court, which this majority affirms, speaks volumes about this results-oriented approach. Dismissing the defense motion to dismiss for lack of jurisdiction, the trial court states "the defense cannot point to any intent on the part of the drafters of the Washington State Constitution to have the northern boundary of the State be inconsistent with the international boundary *except the language of the Constitution itself.*" CP at 53 (emphasis added).

Because the "forty-ninth parallel" is our state's northern border as a matter of law, and because the crimes in this case occurred above the 49th parallel as a matter of fact, the defendants' motion to dismiss should have been granted. Accordingly, the trial court must be reversed and this prosecution dismissed.

I therefore dissent.